936 F.2d 1547
 MULTNOMAH LEGAL SERVICES WORKERS UNION; National
Organization of Legal Services Workers; District
65, Plaintiffs-Appellees,
v.
LEGAL SERVICES CORP., a nonprofit District of Columbia
Corporation, Defendant-Cross-Claimant-Appellant,
v.
MULTNOMAH COUNTY LEGAL AID SERVICE, INCORPORATED, a
nonprofit Oregon Corporation,
Defendant-Cross-Defendant-Appellee.
 No. 89-35762.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1990.
Decided June 25, 1991.
 
 David A. Bledsoe, Calvin L. Keith, Perkins & Coie, Portland, Or., for defendant-cross-claimant-appellant.
 Rosemarie Cordello, Don S. Willner, Willner & Associates, Portland, Or., for plaintiffs-appellees.
 Robert C. Weaver, Jr., Garvey, Schubert & Barer, Portland, Or., for defendant-cross-defendant-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before CANBY, KOZINSKI and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 
 
 1
 Multnomah County Legal Aid Service, Incorporated ("MCLAS") is a legal services organization funded in part by the Legal Services Corporation ("LSC"). This dispute arises from LSC's request to view the personnel files of two MCLAS employees, which was immediately resisted by MCLAS's union. The district court held that LSC's demand for documents was neither necessary nor reasonable, and granted a permanent injunction prohibiting (1) release of the files, and (2) termination of MCLAS's funding for failure to release the files. 723 F.Supp. 1398. LSC timely appeals. We have jurisdiction under 28 U.S.C. Sec. 1291, and we reverse.
 
 
 2
 * LSC is a federally-created, nonprofit corporation that distributes and administers federal funds to approximately 350 legal services programs across the country. MCLAS provides civil legal assistance to indigent clients and receives approximately fifty percent of its $1.2 million annual budget from LSC.
 
 
 3
 LSC has a statutorily-imposed duty to assure that grantee programs operate properly, and that staff attorneys maintain high professional standards:
 
 
 4
 With respect to grants or contracts in connection with the provision of legal assistance to eligible clients under this subchapter, [LSC] shall--
 
 
 5
 (1) insure the maintenance of the highest quality of service and professional standards, the preservation of attorney-client relationships, and the protection of the integrity of the adversary process from any impairments in furnishing legal assistance to eligible clients;
 
 
 6
 ....
 
 
 7
 (4) insure that attorneys employed full time in legal assistance activities supported in major part by [LSC] refrain from (A) any compensated outside practice of law, and (B) any uncompensated outside practice of law except as authorized in guidelines promulgated by [LSC];
 
 
 8
 ....
 
 
 9
 (6) insure that all attorneys engaged in legal assistance activities supported in whole or in part by [LSC] refrain, while so engaged, from--
 
 
 10
 (A) any political activity, or
 
 
 11
 (B) any activity to provide voters or prospective voters with transportation to the polls or provide similar assistance in connection with an election (other than legal advice and representation), or
 
 
 12
 (C) any voter registration activity (other than legal advice or representation)
 
 
 13
 ....
 
 
 14
 (10) insure that all attorneys, while engaged in legal assistance activities supported in whole or in part by [LSC], refrain from the persistent incitement of litigation and any other activity prohibited by the Canons of Ethics and Code of Professional Responsibility of the American Bar Association, and insure that such attorneys refrain from personal representation for a private fee in any cases in which they were involved while engaged in such legal assistance activities.
 
 
 15
 42 U.S.C.A. Sec. 2996f(a) (West Supp.1989).[1]
 
 
 16
 Congress also requires LSC to "monitor and evaluate and provide for independent evaluation of programs supported in whole or in part under this subchapter to insure that the provisions of this subchapter and the bylaws of [LSC] and applicable rules, regulations and guidelines promulgated pursuant to this subchapter are carried out." 42 U.S.C.A. Sec. 2996f(d). To carry out its monitoring responsibility, LSC is authorized to
 
 
 17
 prescribe the keeping of records with respect to funds provided by grant or contract and shall have access to such records at all reasonable times for the purpose of insuring compliance with the grant or contract or the terms and conditions upon which financial assistance was provided.
 
 
 18
 42 U.S.C.A. Sec. 2996g(b) (West Supp.1989) (emphasis added). LSC may "terminate, after a hearing in accordance with section 2996j of this title, financial support to a recipient which fails to comply" with the rules, regulations and guidelines articulated in the LSC Act. 42 U.S.C.A. Sec. 2996e(b)(1)(A).
 
 
 19
 LSC and MCLAS have also entered into an agreement entitled "Assurances Given By Applicant/Recipient As Conditions For Approval Of Grant" (the "Agreement"), which provides in relevant part:
 
 
 20
 [MCLAS] will, upon request, cooperate with all information collection, including ... monitoring ... and compliance evaluation activities undertaken by [LSC], and during normal business hours give any authorized representative of [LSC] ... access to and copies of all records, books, papers and documents, in the possession, custody or control of [MCLAS], except for that properly subject to the attorney-client privilege.
 
 
 21
 (emphasis added).
 
 
 22
 Multnomah Legal Services Workers Union and the National Organization of Legal Service Workers, District 65, UAW (collectively, the "Union") represent MCLAS attorneys and staff. The collective bargaining agreement between MCLAS and the Union (the "CBA") provides that "no information from an employee's personnel file shall be released without the employee's consent, except pursuant to court process."
 
 
 23
 LSC began monitoring MCLAS on April 24, 1989. LSC's monitoring work plan stated that MCLAS personnel files should be reviewed to "assess evaluation process of staff," and to examine staff grievances. On April 27, 1989, David de Latour, an LSC "team leader," arrived at the MCLAS offices and requested five personnel files, those of three non-Union employees and two Union members, Stelle Kednay and Donna Fausnaught.
 
 
 24
 MCLAS allowed LSC to review the personnel files of the three non-Union employees but refused to turn over the files of Fausnaught and Kednay. Louis Savage, Executive Director of MCLAS, showed de Latour a letter from Rosemarie Cordello, a Union attorney, objecting to the release of personnel files. De Latour left, apparently to consult with his superiors in Washington, D.C.
 
 
 25
 Subsequently, de Latour told Savage he wanted access to all personnel files. When Savage asked what specific information de Latour wanted from the files, de Latour responded that LSC policy was to review entire files. Savage then asked to speak to Michelle Ryan, the Union president, to see whether Kednay and Fausnaught would consent to release of their files.
 
 
 26
 At Savage's request, Ryan agreed to ask the employees whether they would consent to release. Ryan also gave Savage a list of items that the Union considered confidential: (1) reasons for personal leave or leave of absence; (2) medical information; (3) names of emergency contact persons; (4) financial information; (5) salary reduction agreements; (6) grievance complaints; (7) disciplinary actions; and (8) home addresses and phone numbers.
 
 
 27
 Bruce McDonald, assistant manager of LSC's Office of Monitoring, Audit, and Compliance, told Emilia DiSanto, the office director, that MCLAS would not allow LSC access to the personnel files. DiSanto asked McDonald whether the document request was reasonable and necessary, and McDonald told her de Latour thought it was. DiSanto does not remember determining whether de Latour could obtain the information he sought from other sources. She told McDonald to telephone MCLAS and seek access to the documents.
 
 
 28
 McDonald telephoned Savage, demanding that MCLAS release the personnel files, and informed him that LSC would consider MCLAS in breach of the Agreement unless the files were released. Savage told McDonald that the information LSC wanted was available from non-confidential sources, and McDonald insisted that the issue was not the information in the files, but rather the "right to see the files."
 
 
 29
 Savage then tried to compromise with de Latour. After de Latour reviewed the Union's list of confidential items, he agreed not to review medical records or emergency contact persons, but he still wanted to review personal leave requests, grievances, and disciplinary actions. Savage told de Latour the information he requested was either available from other files or not in the personnel files at all. de Latour insisted on seeing entire personnel files. de Latour requested and received Kednay's grievance file, which was not in her personnel file.
 
 
 30
 Savage again met with Ryan. She told Savage that the employees would not consent to release.
 
 
 31
 Savage was trapped. He could either breach the CBA by releasing the personnel files, or risk losing half of MCLAS's annual budget by disobeying LSC's demands. Savage decided to release the files. On the afternoon of April 27, 1989, Savage notified the Union that he would release the files on April 28. The Union's attorneys informed Savage that the Union would seek a temporary restraining order ("TRO") to block the release. The Union also filed grievances on behalf of Kednay and Fausnaught, which went directly to arbitration.
 
 
 32
 The Union then filed a complaint in the district court against MCLAS and LSC, alleging MCLAS's proposed release of the files would breach the CBA. The district court granted a TRO prohibiting MCLAS from releasing the files to LSC, and prohibiting LSC from initiating any procedure to terminate MCLAS's funding for its failure to provide the documents.
 
 
 33
 After the TRO was granted, MCLAS and the Union held an arbitration hearing to determine their rights and duties to each other under the CBA. The arbitrator ruled:
 
 
 34
 (1) "[R]elease of information from [Union members'] personnel files ... without their consent ... would violate the provisions of ... the CBA."
 
 
 35
 (2) "[MCLAS] is ordered not to release such information unless consent of the employees is obtained...."
 
 
 36
 (3) "Should the Federal District Court order or direct the release of information from personnel files ..., such release would not violate the provisions of the [CBA] since such release would be considered as being due to court process."
 
 
 37
 Before trial, the Union filed an amended complaint, asserting an additional claim for enforcement of the arbitration award. LSC asserted cross-claims against MCLAS for specific performance of the Agreement and declaratory relief, and a counterclaim against the Union for declaratory relief. MCLAS asserted cross-claims against LSC for declaratory relief and an injunction.
 
 
 38
 At the conclusion of the trial, the district court dismissed LSC's claims and enforced the arbitration decision. It also granted a permanent injunction barring (1) MCLAS "from releasing the personnel files of Union members without their consent, unless MCLAS is required to do so by court order," and (2) "LSC from requiring MCLAS to release the personnel files of Union members, and from terminating or suspending MCLAS's funding because of MCLAS's failure to release the personnel files of Union members."
 
 II
 
 39
 We review the grant of a permanent injunction for an abuse of discretion. Beaton v. Thompson, 913 F.2d 701, 702 (9th Cir.1990). The district court abuses its discretion if its conclusion is based on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions. Brotherhood of Locomotive Eng'rs v. Burlington N. R.R. Co., 838 F.2d 1102, 1104 (9th Cir.1988). "The standard of review over the district court's grant of a permanent injunction must, of course, be segmented according to the component functions performed by the district court.... Accordingly, the district court's findings of fact are reviewed under the clearly erroneous standard." LaDuke v. Nelson, 762 F.2d 1318, 1321 (9th Cir.1985).
 
 
 40
 The district court's interpretation of the LSC Act is a question of law we review de novo. Imel v. Laborers Pension Trust Fund, 904 F.2d 1327, 1330 (9th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 343, 112 L.Ed.2d 308 (1990); Waste Management v. Weinberger, 862 F.2d 1393, 1396 (9th Cir.1988).
 
 
 41
 We are asked to decide whether the district court was correct in prohibiting release of the personnel files. "The basis for injunctive relief is irreparable injury and inadequacy of legal remedies. This requires a court to balance the competing claims of injury and the effect on each party of granting or withholding of the requested relief." Sierra Club v. Penfold, 857 F.2d 1307, 1318 (9th Cir.1988). As we stated in Sierra Club, however, "when actual success on the merits is shown, the inquiry is over and a party is entitled to relief as a matter of law irrespective of the amount of irreparable injury which may be shown." Id. at 1318 n. 16.
 
 
 42
 The Union's request for a permanent injunction was based on LSC's interference with the Union's contractual relations with MCLAS. To establish a claim for intentional interference with a contractual relationship under Oregon law,[2] the Union was required to show that LSC knew the interference was substantially certain to occur as a result of its conduct, and was a necessary consequence of that conduct. Straube v. Larson, 287 Or. 357, 600 P.2d 371, 374 (1979). The Union was not required to prove, however, that LSC acted "for the purpose of interfering." Id. Further, the Union was required to show that LSC interfered "in pursuit of an improper or wrongful motive" or used "an improper or wrongful means." Lewis v. Oregon Beauty Supply Co., 302 Or. 616, 733 P.2d 430, 434 (1987).
 
 
 43
 The court found LSC had "improper motives" for demanding the files because (1) document requests under the LSC Act must be "necessary and reasonable," and (2) LSC's demand to view the personnel files was, in fact, not "necessary and reasonable."[3]
 
 III
 The Necessary and Reasonable Restriction
 
 44
 LSC contends its conduct was proper because it merely "asserted in good faith its legally protected interest under the LSC Act to have access to all of MCLAS's records." It claims an unlimited right of access to all MCLAS's records pursuant to the Agreement and the LSC Act, and asserts that its request for the personnel files "falls squarely within its statutory authority." LSC relies on National Clients Council v. Legal Servs. Corp., 617 F.Supp. 480 (D.D.C.1985),[4] which held:
 
 
 45
 [A]s a matter of law, this Court fully concurs with [LSC's] conclusion that [its] obligation to evaluate and review its grant programs to ensure compliance with the law provides sufficient statutory authority to support the broad right of access to documents set forth [in the Agreement].
 
 
 46
 National Clients, 617 F.Supp. at 490 (emphasis added).
 
 
 47
 Here, the court below agreed that LSC has a "broad right of access to documents." The court also held, however, that "LSC's broad right is not absolute. It is limited by LSC's own regulations, which require that document requests be reasonable and necessary." It appears, with all respect to the district court, that this determination was based on a faulty interpretation of the LSC Act based on consideration of two inappropriate factors. First, the court relied on LSC's internal "Monitoring Handbook" and a confidential LSC memorandum entitled "Access to Documents." Second, it took judicial notice of several post-enactment Congressional statements, including Senate Appropriations Committee reports. We now discuss each in turn.
 
 
 48
 * LSC contends it was erroneous for the district court to rely on internal and confidential LSC documents to limit LSC's right to view MCLAS's personnel files. In its opening brief, LSC argues:
 
 
 49
 The [internal documents] set hortatory goals of issuing document requests that are reasonable and necessary. This is to LSC's credit. Yet they cannot constrain LSC's legal authority under the LSC Act and the 1989 LSC Agreement to have access to all nonprivileged documents.
 
 
 50
 Since the internal documents were not for "public use," LSC argues, they are "not entitled to the force and effect of law against the agency." We agree.[5]
 
 
 51
 Although "an agency can create a duty to the public which no statute has expressly created," United States v. Fifty-Three (53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir.1982), "not all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court." Rank v. Nimmo, 677 F.2d 692, 698 (9th Cir.), cert. denied, 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982). To have the force and effect of law against LSC, the internal documents must "prescribe substantive rules--not interpretive rules, general statements of policy or rules of agency organization, procedure or practice...." Rank, 677 F.2d at 698 (emphasis in original), quoted in United States v. One 1985 Mercedes, 917 F.2d 415, 423 (9th Cir.1990).
 
 
 52
 Two factors determine whether a rule is interpretive or substantive. First, if the rule "modifies" or "effects a change in" existing rights, law or policy, it is a substantive rule with binding effect. W.C. v. Bowen, 807 F.2d 1502, 1504 (9th Cir.1987). If, however, "the rule is only indicative of the agency's interpretation of existing law or policy, it is interpretive." Id.; see also Southern Cal. Aerial Advertisers' Ass'n v. Federal Aviation Admin., 881 F.2d 672, 677 (9th Cir.1989) ("While substantive rules effect a change in existing law or policy, interpretive rules merely clarify or explain existing law or regulations.") (internal quotations omitted).
 
 
 53
 Second, if the rule "is promulgated pursuant to statutory direction or under statutory authority, it is a substantive rule." W.C., 807 F.2d at 1504. If, however, "the agency does not exercise delegated legislative power to promulgate the rule, it is interpretive." Id. To satisfy this requirement, LSC's policy "must have been promulgated 'pursuant to a specific statutory grant of authority,' so that a policy that was 'neither published in the Federal Register nor disseminated to the public for scrutiny and comment' will not have the force and effect of law." One 1985 Mercedes, 917 F.2d at 423 (quoting Rank, 677 F.2d at 698); see also Fifty-Three (53) Eclectus Parrots, 685 F.2d at 1136 (a substantive rule must be promulgated "in conformance with the procedural requirements imposed by Congress"); Balelo v. Baldridge, 724 F.2d 753, 758-59 (9th Cir.1984) (even though a specific grant of regulatory authority is not necessary, a statute must at least provide "broad rule-making authority" from which an implicit power to regulate may be derived).
 
 
 54
 As we noted in One 1985 Mercedes, 917 F.2d at 423, "[a]n agency policy that can only be unearthed by discovery of the agency's internal workings cannot be a policy that was disseminated to the public." Consequently, LSC's internal "Monitoring Handbook" and "Access to Documents" memorandum do not constitute a legally binding interpretation of the LSC Act. They were not issued pursuant to a congressional delegation of rule-making authority, were never published in the Federal Register or in any other medium aimed at non-LSC personnel, and hence are merely interpretive rules. As such, the district court erred in considering the internal documents.
 
 B
 
 55
 LSC also objects to the court's reliance on various statements appearing in the Congressional Record and the Senate Appropriations Committee Report on Appropriations of 1987 and 1988, which states:
 
 
 56
 [T]he Committee directs that all monitoring, auditing, and evaluation of grantees and contractors conducted with funds provided in the appropriations shall be carried out so that ... [r]equests for production of documents and other materials are reasonable and pertinent.
 
 Senate Report No. 100-238.[6]
 
 57
 LSC argues these are merely "reports concerning appropriations bills submitted by the Senate Committee on Appropriations.... The LSC Act should not be rewritten by incorporation of two precatory phrases from committee reports." Further, they contend, legislative intent must be judged as of the time of the statute's enactment. See United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358-59, 8 L.Ed.2d 590 (1962). LSC relies primarily on United States v. Clark, 445 U.S. 23, 33 n. 9, 100 S.Ct. 895, 902 n. 9, 63 L.Ed.2d 171 (1980), which states, "the views of some Congressmen as to the construction of a statute adopted years before by another Congress have 'very little, if any, significance.' " (citations omitted). We agree.
 
 
 58
 Post-enactment statements and isolated committee remarks do not control our interpretation of the LSC Act. See, e.g., Tennessee Valley Auth. v. Hill, 437 U.S. 153, 188-90, 98 S.Ct. 2279, 2298-2300, 57 L.Ed.2d 117 (1978) (rejecting repeal by appropriation and stating that Appropriation Act and Committee reports are not clear indications of congressional intent); Libby Rod & Gun Club v. Poteat, 594 F.2d 742, 746 (9th Cir.1979) ("[W]e are hesitant ... to interpret isolated remarks in committee hearings or reports as expressions of the intent or knowledge of Congress."); Brock v. Writers Guild of Am., West, 762 F.2d 1349, 1356 (9th Cir.1985) ("[P]ost-enactment statements ... constitute poor evidence of Congressional intent").
 
 
 59
 Justice Scalia's concurrence in Sullivan v. Finkelstein, --- U.S. ----, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990), offers additional support for LSC's position:
 
 
 60
 The legislative history of a statute is the history of its consideration and enactment. "Subsequent legislative history"--which presumably means the post-enactment history of a statute's consideration and enactment--is a contradiction in terms. The phrase is used to smuggle into judicial consideration legislators' expressions not of what a bill currently under consideration means (which, the theory goes, reflects what their colleagues understood they were voting for), but of what a law previously enacted means.
 
 
 61
 ....
 
 
 62
 In my opinion, the views of a legislator concerning a statute already enacted are entitled to no more weight than the views of a judge concerning a statute not yet passed.
 
 
 63
 ....
 
 
 64
 Arguments based on subsequent legislative history, like arguments based on antecedent futurity, should not be taken seriously, not even in a footnote.
 
 
 65
 (emphasis in original).
 
 
 66
 Accordingly, we conclude the district court erred in relying on post-enactment Congressional statements to interpret the substance of the LSC Act.
 
 
 67
 In summary, the plain language of the statute creates a right of access to documents that is limited only by the statute itself and the contract between LSC and MCLAS. It was erroneous as a matter of law for the district court to impose the artificial "necessary and reasonable" requirement, an error apparently caused by the court's reliance on stray post-enactment statements of legislators and internal LSC documents that did not purport--nor could they--to alter the terms of the LSC Act or the Agreement.
 
 C
 
 68
 On appeal, the Union argues for the first time that LSC's document requests are subject to an "inherent" reasonableness requirement, independent of the LSC Act and LSC's internal regulations. They assert that "every court that has reviewed statutes authorizing agencies to inspect records has found that the right of inspection is not absolute," but subject to an inherent requirement of "reasonableness."[7] In response, LSC claims the reasonableness requirement applies "only to governmental agencies," which LSC is not. Again, we agree with LSC.
 
 
 69
 Although LSC grants and administers federal funds, the LSC Act specifically provides:
 
 
 70
 [O]fficers and employees of [LSC] shall not be considered officers and employees, and [LSC] shall not be considered a department, agency, or instrumentality of the Federal Government.
 
 
 71
 42 U.S.C.A. Sec. 2996d(e). Consistent with this language, other district courts have concluded that LSC is not an arm of the government. See Newman v. Legal Servs. Corp., 628 F.Supp. 535, 540 (D.D.C.1986) (LSC is not a "state actor" for constitutional purposes); Neighborhood Legal Servs. v. Legal Servs. Corp., 466 F.Supp. 1148, 1151 (D.Conn.1979) (LSC is exempt from general coverage of the Administrative Procedure Act).
 
 
 72
 We too have held that LSC is not subject to the APA. Spokane County Legal Servs. v. Legal Servs. Corp., 614 F.2d 662 (9th Cir.1980). Nonetheless, we also held that LSC funding decisions are subject to the rationality review applied to agency decisions prior to the advent of the APA. Id. But that does not mean LSC should be treated as a pre-APA agency for all purposes. Congress has explicitly declared that LSC is not an agency or instrumentality of the government; we are not free to read that declaration out of the LSC Act.
 
 
 73
 For many purposes, LSC is entirely unlike a government agency. It does not regulate an industry or area of public concern; it cannot impose its will on entities which then have no choice but to submit. Instead, it operates through consensual relationships formed with those who receive its funding. Where the LSC's authority derives from the existence of such a consensual relationship, it is inappropriate to review its actions as we might those of an administrative agency.
 
 
 74
 In Spokane County, LSC was not acting as a party to a consensual relationship but rather as a sovereign, a distributor of government largesse; it had unilaterally decided to terminate a recipient's funding. We appropriately held that LSC's decision was subject to review under pre-APA standards. Here, in contrast, LSC and MCLAS have voluntarily entered into a relationship and the dispute concerns their rights in that relationship. This same distinction also separates LSC's document requests from those of agencies like the Interstate Commerce Commission and the Civil Aeronautics Board. Burlington Northern v. ICC, 462 F.2d 280, 287-88 (D.C.Cir.), cert. denied, 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972); Civil Aeronautics Bd. v. United Airlines, 542 F.2d 394, 399-400 (7th Cir.1976). Those agencies have the power to demand documents from all private entities within their jurisdiction; LSC cannot. It may only request documents from entities that have agreed to be subject to document requests in exchange for funding. We therefore see no need to judicially impose a "necessary and reasonable" requirement. Instead, LSC's requests for documents should be judged by the terms of the LSC-MCLAS relationship, including those terms Congress set forth in the LSC Act and any additional consistent terms agreed upon by the parties.
 
 
 75
 Because LSC is not a government agency, therefore, we conclude there is no inherent reasonableness requirement.
 
 D
 
 76
 We recognize that the plain language of the LSC Act as well as the holding in National Clients indicate that LSC's right of access is not absolute, but rather is limited to requests "for the purpose of insuring compliance with the grant ... or the terms and conditions upon which financial assistance was given." 42 U.S.C.A. Sec. 2996g(b). LSC can access all MCLAS's documents, so long as the request is to determine whether MCLAS is in compliance with the LSC Act. This is the only limitation.
 
 
 77
 Surely, however, Congress did not intend to give LSC a license for harassment. Indeed, there is evidence in the record tending to show that LSC demanded these documents not for the purpose of ensuring compliance, but rather to harass MCLAS. One witness, James Benny Jones, testified that "the monitoring division wanted to scrutinize Mr. Savage's program in light of his perceived liberalism." This is hardly a proper motive with regard to demanding any records of MCLAS, much less confidential personnel files.
 
 
 78
 If LSC's conduct amounted to harassment, it would establish the "improper purpose" or "wrongful means" necessary to state a case for intentional interference with contractual relations under Oregon law. We cannot affirm the district court, however, because its findings regarding LSC's motive are based on improper considerations. The court relied primarily on (1) the availability from other, non-confidential sources of any information relevant to LSC's inquiry, (2) recent congressional criticism of LSC's conduct in connection with document requests, and (3) LSC's general pattern of "hostile" behavior while monitoring grantee programs. We do not believe these findings support the conclusion that LSC's motive in asking for the personnel files in this case was improper.
 
 
 79
 First, even if the information LSC seeks is available elsewhere, LSC representatives testified that it is essential to cross-check the information against the original documents--the personnel files. Also, LSC offered testimony that direct review of personnel files is essential to the effective evaluation of recruitment, hiring, compensation, training, working conditions, promotions, benefits, layoffs, discipline, and discharge.
 
 
 80
 Second, neither general congressional criticism of LSC's conduct nor evidence of LSC's behavior in connection with other grantee programs sheds light on LSC's motive in requesting these personnel files from MCLAS, under this particular set of circumstances. Furthermore, such statements are not admissible evidence; they are hearsay, and unreliable hearsay at that. None were given under oath; none of the declarants were percipient witnesses or subject to cross-examination; the declarations may have been politically motivated; and all declarants were protected by absolute immunity. The district court erred in using such out of court comments as evidence.
 
 IV
 
 81
 The Implied Covenant of Good Faith and Fair Dealing
 
 
 82
 Having determined that LSC's document request did not violate the LSC Act or exceed the terms of the Agreement, we now consider whether LSC may have breached a contractual duty.
 
 
 83
 The Agreement gives LSC access to "all" documents in MCLAS's possession, "except those properly subject to the attorney-client privilege." We can only conclude that "all" means "all"--including personnel files--and there is absolutely nothing in the record to indicate that personnel files are somehow out of the statutory bounds. Despite the absolute language of the contract, however, the Agreement is subject to an implied covenant of good faith and fair dealing under Oregon law. Gruver v. Midas Int'l Corp., 925 F.2d 280 (9th Cir.1991) (citing Best v. United States Nat'l Bank of Oregon, 303 Or. 557, 739 P.2d 554, 557 (Or.1987)). Under the circumstances, it is arguable that LSC's demand may have breached this covenant.
 
 
 84
 Here, however, we deal not just with any party, but an entity that has been granted special powers by Congress. If the LSC Act grants LSC the authority to review the documents, state law cannot limit LSC's exercise of that authority. See McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 425-36, 4 L.Ed. 579 (1819) (state may not interfere with operation of federally chartered corporation by taxing it); Osborn v. Bank of the United States, 22 U.S. (9 Wheat) 737, 862-68, 6 L.Ed. 204 (1824) (same).[8] To the extent the covenant of good faith and fair dealing is a rule of state law that purports to limit LSC's authority to demand documents pursuant to the LSC Act, therefore, it is preempted.
 
 
 85
 Again, however, the LSC Act was violated if LSC's demand went beyond the purpose of ensuring compliance. If LSC's behavior in this instance was not motivated by legitimate concerns, thereby violating the LSC Act, it also breached the state law covenant of good faith and fair dealing. We therefore remand for further proceedings to determine whether LSC's conduct constituted harassment.
 
 V
 Remaining Issues
 
 86
 The remaining issues turn on whether LSC breached a statutory or contractual duty. The district court made the following rulings:
 
 
 87
 (1) The CBA does not conflict with LSC's statutory mandate to monitor grantee legal services programs because LSC's document requests must be "necessary and reasonable";
 
 
 88
 (2) The prior arbitration award is binding and enforceable. The arbitrator held "release of the personnel files without the employees' consent would violate the CBA";
 
 
 89
 (3) LSC's claim for specific performance of the Agreement was denied; and
 
 
 90
 (4) LSC's claim for a judgment declaring that the LSC Act and the Agreement authorize LSC to access all MCLAS documents was denied.
 
 
 91
 The district court must determine whether LSC breached its duty under the LSC Act or state contract law, and dispose of the remaining issues accordingly.
 
 VI
 Conclusion
 
 92
 The district court erred in finding that LSC's document requests must be necessary and reasonable. The plain language of the LSC Act gives LSC a broad right of access to documents, limited only by the express statutory constraints. To be valid, LSC's demand for personnel files must fall squarely within the boundaries of the LSC Act and the Agreement.
 
 
 93
 Because the court relied on post-enactment Congressional statements and LSC's internal documents, the permanent injunction was based on an erroneous interpretation of the LSC Act. However, LSC may have breached the statutory duty or the covenant of good faith and fair dealing, and we remand for trial on that issue. Accordingly, the district court's judgment is
 
 
 94
 REVERSED and the matter is REMANDED for proceedings consistent with this opinion.
 
 CANBY, Circuit Judge, dissenting:
 
 95
 I agree with much of what Judge Trott has said, and I particularly agree that LSC's right of access to grantee records is limited by the requirement that the requested access be for the purpose of insuring compliance with the LSC Act and the conditions of the grant. I also concur in the conclusion that LSC's contract with MCLAS is subject to an implied covenant of good faith and fair dealing. With respect to the requirement of "reasonableness and necessity," I agree that the district court erred in giving binding effect to LSC's internal documents. I also agree that miscellaneous post-enactment committee reports or statements of legislators cannot be used to read such a requirement into the LSC Act.
 
 
 96
 In my view, however, these latter errors are harmless, because general principles of administrative law require us to assume that Congress intended LSC's statutory access to documents to be constrained by requirements of reasonableness. Congress provided that LSC was "authorized to prescribe the keeping of records with respect to funds provided by grant or contract and shall have access to such records at all reasonable times for the purpose of insuring compliance with the grant or contract or the terms and conditions upon which financial assistance was provided." 42 U.S.C. Sec. 2996g(b) (emphasis added). As the majority opinion recognizes, this provision does not grant access to all records for all purposes; it grants access to the prescribed records for a specified purpose.
 
 
 97
 Faced with an analogous grant of inspection authority to the Interstate Commerce Commission, the Supreme Court long ago held that the Commission could not inspect a railroad's correspondence. United States v. Louisville & Nashville R.R., 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915). Even though Congress subsequently broadened the statute to grant the Commission access to "all documents, papers, and correspondence ... kept or required to be kept by carriers ...," Transportation Act of 1920 Pub.L. No. 66-152, 41 Stat., 456, 493 (1920), the District of Columbia Circuit held that the Commission was nevertheless limited to inspection of materials in which the "need for information" for the statutory enforcement purpose "was evident." Burlington Northern, Inc. v. ICC, 462 F.2d 280, 288 (D.C.Cir.1972).
 
 
 98
 We, too, have applied a "reasonableness" requirement to the ICC, borrowing the standard applied to Internal Revenue Service summonses, which requires a showing:
 
 
 99
 that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, [and] that the information sought is not already within the Commissioner's possession....
 
 
 100
 United States v. Southern Pacific Transp. Co., 691 F.2d 883, 885 (9th Cir.1982) (quoting United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-55, 13 L.Ed.2d 112 (1964)). See also Midwest Growers Co-Op. Corp. v. Kirkemo, 533 F.2d 455, 461 (9th Cir.1976) ("the Commission in exercising its statutory power to inspect is limited by the same standards of reasonableness applicable to other administrative agencies"). Similarly, in construing a broad inspection authority under the Federal Aviation Act, the Seventh Circuit summarized:
 
 
 101
 [T]he decisions uniformly require that an investigative demand be reasonably definite and reasonably relevant to some proper investigative purpose.
 
 
 102
 CAB v. United Airlines, Inc., 542 F.2d 394, 399 (7th Cir.1976).
 
 
 103
 The majority holds, however, that because LSC is not a governmental agency, these principles of administrative law do not apply. I cannot agree. It is true that Congress has provided that "[e]xcept as otherwise specifically provided in this subchapter, officers and employees of the Corporation shall not be considered officers or employees, and the Corporation shall not be considered a department, agency, or instrumentality, of the Federal Government." 42 U.S.C. Sec. 2996d(e)(1). Although this disclaimer has undeniable effects, it does not necessarily deprive everything LSC does of all attributes of federal action. LSC is a most unusual "private" organization. Its Board of Directors is appointed by the President with the advice and consent of the Senate, and no more than six directors may be of the same political party. 42 U.S.C. Sec. 2996c(a). Its officers and employees may not be compensated in excess of the federal Executive Schedule. Sec. 2996d(d). It is subject to the Freedom of Information Act and the federal open meetings provisions. Id. at (g); 42 U.S.C. Sec. 2996c(g). LSC's officers and employees are considered officers and employees of the Federal Government for purposes of workers' compensation, civil service retirement, and life and health insurance benefits. 42 U.S.C. Sec. 2996d(f). LSC is authorized to issue regulations, which must be published in the Federal Register. 42 U.S.C. Sec. 2996g(e). In light of all of these governmental characteristics with which Congress has endowed LSC, it is not sensible to read the disclaimer of section 2996d(e) as evincing an intention that LSC never be treated as if it were governmental, no matter what the situation.
 
 
 104
 In fact, our court has addressed the congressional disclaimer and has nevertheless treated LSC as a governmental agency. In Spokane County Legal Services v. Legal Services Corp., 614 F.2d 662 (9th Cir.1980), we were presented with an action by a local provider whose program had been terminated by LSC. The provider sought judicial review of LSC's decision, alleging that it was arbitrary and capricious. We recognized that Congress' disclaimer removed LSC from the Administrative Procedure Act, but we nevertheless subjected LSC's decision to review:
 
 
 105
 Since LSC is not an agency of the Federal Government, its decisions are not reviewable under the APA. [Citation omitted.]
 
 
 106
 In view of these circumstances, we think it appropriate to adopt the rule which the Supreme Court fashioned for judicial review of administrative decisions before the advent of the APA.... If there is a rational basis for the agency decision and it is supported by some evidence, the decision should be accepted by the reviewing court.
 
 
 107
 Id. at 669. Since we held LSC's termination decision in Spokane to the standard of rationality established for judicial review prior to the APA, it is quite appropriate to hold its inspection authority to the standards of reasonableness similarly evolved prior to the APA.
 
 
 108
 I do not see any significance in the distinction of Spokane offered by the majority opinion--that in Spokane LSC was not acting as a party to a consensual relationship but as a sovereign distributor of largesse. To my mind, the relationship in Spokane between LSC as grantor and the local grantee was as consensual as the one involved here. In Spokane, LSC sought unilaterally to terminate that relationship; here, LSC unilaterally seeks access to personnel files with a threat of unilateral termination of the grant to back up its demand. I see no difference in principle or effect between the two instances. Nor do I accept the suggestion that the government in its funding of agencies providing services to the indigent should be freed from the requirements of reasonableness that constrain the government when it regulates railroads. The facts of this case show that there is ample potential for oppression in the grantor-grantee relationship.
 
 
 109
 As I have stated, the reasonableness requirement for inspection of documents stems from the statutory purpose for which such inspection is authorized. See, e.g., United States v. Southern Pacific Transp. Co., 691 F.2d 883, 885 (9th Cir.1982). By the same compulsion, I would read a reasonableness requirement into the inspection clause of the contract between LSC and Multnomah County Legal Aid Service, Inc. The contractual clause in question, which requires Multnomah to give LSC access to "all" documents in Multnomah's control except those subject to attorney-client privilege, is part of a clause requiring Multnomah to cooperate with LSC's compliance and monitoring activities. The purpose for which Multnomah promises access to documents is apparent; it is the same purpose for which the statute gives LSC access to records--to insure compliance with the proper conditions of the grant. The contractual right of access is therefore no broader than the statutory right of access. And a contractual promise to deliver "all" records is no more free from limitation than were the statutory directions that the ICC and the CAB have access to "all" records. See Burlington Northern, 462 F.2d at 287; United Airlines, 542 F.2d at 399-400.
 
 
 110
 I would therefore hold that LSC's right, statutory or contractual, to inspect the personnel files held by Multnomah is subject to the requirement that the demand for the files be reasonable and relevant to the purpose of ensuring compliance with Multnomah's grant conditions. In determining reasonableness, the district court was entitled to take into account the fact that inspection of personnel files implicates the privacy interests of the employees in question.
 
 
 111
 The district court found that LSC's officers had originally been unable to say why they needed the personnel files, and that its work plan had only referred to personnel files in connection with their aid in assessing staff evaluations and grievances. The district court found, however, that Multnomah's personnel files contained neither grievances nor evaluations. The court found that LSC had only belatedly asserted the interests of detecting discrimination and ferreting out sloppy personnel practices, and that "[e]very piece of information LSC claims to need is available elsewhere." Moreover, the district court explicitly credited the statement of James Benny Jones that Anthony Gomes, manager of LSC's monitoring division, "wanted to scrutinize [Multnomah] in light of Savage's perceived liberalism." Although the district court also referred to other, more questionable evidence of improper purpose, the above findings, which were supported by evidence in the record and were not clearly erroneous, clearly support the district court's determination that LSC's demand for access to the personnel files in issue was unreasonable. I would therefore affirm the judgment.
 
 
 
 [1]
 42 U.S.C. Secs. 2996-2996k will be referred to generally as the "LSC Act."
 
 
 [2]
 The parties agree that Oregon law controls the CBA. In general, claims for tortious interference with CBAs are preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (the "LMRA"). Scott v. Machinists Automotive Trades Dist. Lodge No. 190, 827 F.2d 589, 591-2 (9th Cir.1987) (per curiam) (claim for intentional interference with CBA preempted by section 301 of the LMRA because resolution of claim requires interpretation of CBA). By not raising this issue, however, LSC has waived it
 
 
 [3]
 The court disposed of Straube's knowledge requirement in summary fashion: "LSC knew that the CBA provision prohibited MCLAS from releasing personnel files without employee consent. LSC also knew that the Union specifically objected to release."
 
 
 [4]
 The agreement in National Clients contained substantially the same language as that in the present Agreement
 
 
 [5]
 We assume for the sake of addressing this issue that LSC is a federal agency, although we conclude in subsection C below that it is not. We take this approach to demonstrate that even if LSC were a federal agency, its internal guidelines could not circumscribe its legal authority under the LSC Act
 
 
 [6]
 The files in question were requested in 1989. Because the 1989 Appropriations Committee Report did not include the "reasonable and pertinent" restriction, the Union and MCLAS do not claim the command of the Appropriations Committee should be given the force of law. Rather, they argue the 1987 and 1988 statements should be treated as evidence of "specific legislative intent"--which should not be ignored in construing the LSC Act. See, e.g., National Senior Citizens Law Center v. Legal Servs. Corp., 751 F.2d 1391, 1397 (D.C.Cir.1985) (appropriations rider is "worthy of considerable respect," even though it constitutes post-enactment history). As we explain, we disagree with this view
 
 
 [7]
 See, e.g., California Bankers Ass'n v. Schultz, 416 U.S. 21, 62, 94 S.Ct. 1494, 1517-18, 39 L.Ed.2d 812 (1974); United States v. Powell, 379 U.S. 48, 57-58, 85 S.Ct. 248, 254-55, 13 L.Ed.2d 112 (1964); United States v. Morton Salt, 338 U.S. 632, 652, 70 S.Ct. 357, 368-69, 94 L.Ed. 401 (1950); Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209, 66 S.Ct. 494, 505-06, 90 L.Ed. 614 (1946); Seaboard System R.R. v. Interstate Commerce Comm'n, 827 F.2d 699, 704-05 (11th Cir.1987); United States v. Southern Pac. Transp. Co., 691 F.2d 883, 885 (9th Cir.1982); Civil Aeronautics Bd. v. United Airlines, 542 F.2d 394, 398-99 (7th Cir.1976); Midwest Grower Coop. Corp. v. Kirkemo, 533 F.2d 455, 461 (9th Cir.1976); Burlington N. v. Interstate Commerce Comm'n, 462 F.2d 280, 284-88 (D.C.Cir.), cert. denied 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972)
 
 
 [8]
 McCulloch and Osborn may be more on point than first meets the eye: Both deal with a state's interference or limits on a federally created corporation, the Bank of the United States. See McCulloch, 17 U.S. (4 Wheat) at 400; LSC is a federally created corporation. And the Bank of the United States was largely a private institution, just like LSC. See Gunther, Constitutional Law 91-92 (11th ed. 1985)