PROTECT LAKE PLEASANT, LLC, an Arizona limited liability company; David Maule–Ffinch; Michael Viscuis; and Pensus Group, L.L.C., an Arizona limited liability company, Plaintiffs

v.

J. William McDONALD in his official capacity as Commissioner, United States Bureau of Reclamation;[1] United States Bureau of Reclamation; an agency of the United States Department of Interior, and Ken Salazar, in his official capacity as Secretary, United States Department of Interior,[2] Defendants

and

Lake Pleasant Marina Partners, LLC, an Arizona limited liability company, Defendant–Intervenor.

No. CIV 07–0454–PHX–RCB.

United States District Court, D. Arizona.

March 23, 2009.

---

**1.** In accordance with Fed.R.Civ.P. 25(d), which allows for substitution when, among other reasons, "a public officer who is a party in an official capacity ... ceases to hold office while the action is pending[,]" the court hereby substitutes J. William McDonald, Acting Commissioner of the Bureau of Reclamation ("BOR"), for Robert W. Johnson, former BOR Commissioner.

**2.** As with Mr. Johnson, in accordance with Fed.R.Civ.P. 25(d), the court hereby substitutes Ken Salazar, current Secretary of the Interior, for Dirk Kempthorne, former Secretary of the Interior.

Andrew Mark Federhar, Lori Anne Higuera, Todd Christopher Wiley, Fennemore Craig PC, Robert Clifford Hackett, Daniel Joseph Kiley, Sherman & Howard LLC, Phoenix, AZ, Cynthia L. Taub, John J. Duffy, Steptoe & Johnson LLP, Washington, DC, for Plaintiffs.

Sue A. Klein, US Attorney's Office, Phoenix, AZ, for Defendants.

Marc Allen Erpenbeck, Ronald W. Messerly, Snell & Wilmer LLP, Phoenix, AZ, for Intervenor–Defendant.

## ORDER

ROBERT C. BROOMFIELD, Senior District Judge.

In count one of their First Amended Complaint ("FAC") plaintiffs allege that the United States Bureau of Reclamation ("BOR"),[3] by authorizing Maricopa County ("the County") to proceed with the development and construction of the Scorpion Bay Marina & Yacht Club at Lake Pleasant Regional Park ("LPRP"), violated the Federal Property and Administrative Services Act of 1949 ("FPASA"), as well as various related regulations and BOR Directives and Standards ("D & Ss") and policies.

Currently pending before the court is plaintiffs' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56 on count one (doc. 88). BOR is cross-moving for that same relief (doc. 114). Defendant/intervenor Lake Pleasant Marina Partners, LLC, ("Partners") filed a "counter motion" for partial summary judgment also directed to count one (doc. 110). Three motions to strike, by BOR (doc. 106); ("Partners") (doc. 107); and plaintiffs (doc. 124) are also pending. Finally, plaintiffs are moving to supplement the thirteen volume administrative record (doc. 87).[4]

### Background

This recitation of facts is for the limited purpose of providing a factual overview of plaintiffs' FPASA claims in count one of the FAC. These facts will be further developed herein as necessary to resolve discrete issues, such as jurisdiction, which these motions raise.

Two agreements figure prominently in plaintiffs' FPASA claims—the 1990 "Recreational Management Agreement" ("RMA") between BOR and the County and the "Use Management Agreement" ("UMA") between the County and Partners. The statutory authority for the first agreement, the RMA, is the Federal Wa-

---

3. Hereinafter BOR shall be read as including the individual federal defendants as well, Messrs. McDonald and Salazar.

4. As Fed.R.Civ.P. 78(b) allows, the court will decide these motions without oral argument and thus denies the parties' requests in that regard. The court is quite familiar with this litigation and the parties provided fairly comprehensive briefs on the issues. Consequently, oral argument will not aid the court's decisional process, and its denial will not result in prejudice to any party. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev. Corp.,* 933 F.2d 724, 729 (9th Cir.1991) (no prejudice in refusing to grant oral argument "[w]hen a party has [had] an adequate opportunity to provide the trial court with evidence and a memorandum of law[ ]").

ter Project Recreation Act. Admin. Rec., Vol. 1 at 1. In that RMA, BOR "designat[ed]" the County as its "exclusive recreational management contractor[.]" *Id.* at 4, Art. 2(a). As part of that Agreement, the County transferred "existing park facilities and related property interests" to BOR. *Id.* at 6, Art. 4. The consideration for that transfer took several forms. As part of that consideration, with BOR's "approval[,]" BOR granted to the County "the authority ... to enter into third party concession agreements[,]" such as the "Use Management Agreement" ("UMA") entered into between the County and Partners for the LPRP marina. *See id.* at 7, Art. 4(c)(4). Another aspect of that consideration was BOR's $2,500,000.00 payment to the County to "be utilized only in connection with the recreational development of the LPRP wherein [BOR] has Federal land management responsibility." *Id.* at 7, Art. 4(c)(6).

Article 13 of the RMA delineated the circumstances under which the County could "enter into direct agreements with third parties to operate concession attractions, developments or services on the LPRP[.]" *Id.* at 15, Art. 13(a). In that Article, the County "agree[d] to provide to [BOR] for its approval, a copy of each third party concession agreement involving a pre-approved use as set forth" later in Article 13. *Id.* The marina complex which was the subject of the UMA is included in that "pre-approved list." *See id.* At 16, Art. 13(d)(3); (d)(4); and (d)(6). "Subject to final [BOR] approval," the RMA also provided that the County "may consider" the marina complex, among other items, to

be "pre-approved for negotiation purposes[.]" *Id.*

In 2005 the County issued a Request for Proposal ("RFP") for the Scorpion Bay Marina. That RFP contained a clause, section 6.8, entitled "Competition, Non–Collusion & Conflict of Interest[.]" PSOF (doc. 89)[5], exh. 29 thereto at BOR-FOAI00315. Plaintiffs view that clause as "anti-competitive," whereas defendants view it as "pro-competition." Regardless, essentially section 6.8 precluded any party possessing any commercial interest adjacent to or near Lake Pleasant from bidding on that project. Because plaintiff Pensus Group ("Pensus") operates a marina adjacent to the Lake, it claims that in light of section 6.8, it could not bid on the project. In response to the 2005 RFP, Partners submitted the only bid for the Scorpion Bay project.

As the next step in the process, the County prepared a Proposed ("UMA") for Partners. Plaintiffs allege that the Proposed UMA "varied significantly from the terms contained in the 2005 RFP." FAC (doc. 4) at 11, ¶ 43. In particular, the 2005 RFP included two provisions which were not in the Proposed UMA. According to plaintiffs, the 2005 RFP included an encumbrance provision prohibiting the concessionaire from mortgaging or encumbering marina improvements, whereas the Proposed UMA did not include such a provision. Furthermore, the 2005 RFP included a provision mandating that the concessionaire transfer all marina improvements to the County upon termination of any contract entered into pursuant to that RFP, PSOF (doc. 89), exh. 29

---

**5.** These motions present a procedural conundrum. On the one hand, defendants are seeking to strike nearly all of the exhibits included with plaintiff's statement of facts ("PSOF"), while at the same time, they are arguing lack of jurisdiction. Plainly, if the court is without jurisdiction, it would not have the power to rule on the motions to strike or plaintiffs' motion to supplement. Because the defendants are not moving to strike exhibits 29 (the 2005 RFP) and 30 (the Proposed UMA), the court will consider those documents, which, in any event, evidently are part of the Administrative Record.

thereto at 5, § 2.0, whereas the Proposed UMA omitted that reversion provision. Then, despite the fact that the 2005 RFP did not give the concessionaire a "right of first refusal" with respect to 30 additional acres of land, the Proposed UMA did. Subsequently, the BOR approved the Proposed UMA as tendered by the County. Admin. Rec., Vol. 1 at 000162. In turn, the County entered into a Final UMA with Partners for the development and operation of Scorpion Bay Marina. *See id.* Vol. 1 at 000163–000210.

Broadly stated, based upon the foregoing plaintiffs contend that the BOR violated the FPASA by not ensuring "full and open competition" with respect to the Scorpion Bay Marina bidding process. For one thing, plaintiffs allege that the BOR improperly allowed the County to include section 6.8 in the 2005 RFP. The result, according to plaintiffs was a "lack of competition for the 2005 RFP" and a concomitant "contract price substantially below market value." Pl. Mot. (doc. 88) at 16:6–7.

Second, plaintiffs contend that the BOR improperly allowed the County to make material changes to the UMA. One purported material change is that the encumbrance and reversion provisions, mentioned above, which had been in the 2005 RFP were not included in the Final UMA. Another improper material change, according to plaintiffs, is that the Final UMA included a right of first refusal which did not appear anywhere in the 2005 RFP.

The underlying theory of plaintiffs' FPASA claims is that the "BOR has independent oversight responsibilities" with respect to non-federal partners, such as the County. *See id.* at 17:9. Based upon that theory, the FAC sweepingly alleges that "BOR's failure to ensure [the] County's compliance with applicable law, regulation, and policy was arbitrary and capricious, an abuse of discretion, and a violation of gov-

erning provisions of federal law." FAC (doc. 4) at 18, ¶ 82. In similarly broad language, plaintiffs further allege that "BOR's approval of the Proposed UMA, which was based on the illegal 2005 RFP, was also arbitrary and capricious, an abuse of discretion, and a violation of governing provisions of federal law." *Id.* at 18, ¶ 83. Plaintiffs conclude count one by alleging:

> The consequences of BOR's unlawful action are, among others, a prima facie violation of federal procurement law that excluded Plaintiffs Maule–Ffinch and Pensus from responding to the 2005 RFP for which they were highly and uniquely qualified and known to be a financially viable candidate.

*Id.* at 18, ¶ 84. In their motion for partial summary judgment plaintiffs are seeking a declaration that the Final UMA is "illegal and void *ab initio.*" Pl. Mot. (doc. 88) at 1.

Succinctly stated, BOR's response is that for the most part, in count one plaintiffs are focusing on the County's actions, and obviously the County is not a party to this lawsuit. As for the RFP which is the subject of count one, BOR stresses that it was "neither authorized by nor subject to [BOR's] approval." BOR Resp. (doc. 113) at 25:22. Turning to the UMA, over which BOR did have final approval, BOR asserts that it is entitled to summary judgment as to count one because its decision to approve that agreement "was not arbitrary, capricious or otherwise not in accordance with the law." *Id.* at 9.

As the private entity which ultimately was awarded the UMA for the marina, Partners' interests differ from those of the BOR, and their arguments herein reflect those differences. Instead of focusing on plaintiffs' interactions with BOR, Partners focuses on plaintiffs dealings with the County. It first argues that plaintiff Pensus failed to exhaust available County administrative remedies. Similarly, Partners

maintains that "the Arizona Court of Appeals has already found that the County followed local procurement procedures[.]" Part. Mot. (doc. 110) at 4:16–17. Next, Partners assert that jurisdiction properly lies in the Court of Federal Claims, not this district court. Finally, Partners claims that they are entitled to summary judgment as to count one because plaintiffs "failed to object to the County's 2005 RFP in a timely manner." *Id.* at 6:3–4. Importantly, Partners expressly joins in BOR's summary judgment motion. *Id.* at 1:9–11.

### Discussion

#### I. Jurisdiction

In responding to plaintiffs' motion for partial summary judgment and in cross-moving for partial summary judgment, BOR strongly implies that subject matter jurisdiction is lacking here. Similarly, presupposing that count one is a "bid protest," Partners assert jurisdiction lies with the Court of Federal Claims—not with this court. Part. Mot.[6] (doc. 110) at 5:21.

Lack of subject matter jurisdiction is not the first argument which defendants advance on these motions. Consistent with the established principle, that "[f]ederal courts must determine that they have jurisdiction before proceeding to the merits[,]" the court will address this issue first. *See Lance v. Coffman,* 549 U.S. 437, 439, 127 S.Ct. 1194, 1196, 167 L.Ed.2d 29 (2007) (citation omitted). Indeed, the court must proceed in this way given the Supreme Court's admonition against " 'assuming' jurisdiction for the purpose of deciding the merits—the 'doctrine of hypothetical jurisdiction.' " *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) (citation omitted). Only when it has satisfied itself that it has subject matter jurisdiction can

the court consider the parties' respective summary judgment motions, and the other pending motions. That is so because " '[w]ithout jurisdiction the court cannot proceed at all in any cause.' " *Id.* (quoting *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868)). " 'Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.' " *Id.* (quoting *McCardle,* 7 Wall. at 514). Indicative of those well-settled principles, Rule 12(h)(3) mandates that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added).

The pending summary judgment motions pertain only to count one, wherein plaintiffs allege violations of, *inter alia,* the FPASA. Plaintiffs do not invoke jurisdiction under that Act, however. Rather, they list three separate jurisdictional bases: (1) 28 U.S.C. § 1331 (federal question); (2) 5 U.S.C. §§ 701–706 (the Administrative Procedure Act) ("APA"); and (3) 28 U.S.C. § 1361 (the mandamus statute). FAC (doc. 4) at 2, ¶ 2. Plaintiffs are seeking declaratory relief pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 2202, but the FAC does not rely upon either of those statutes as a jurisdictional basis. *See id.*

Defendants' initial subject matter jurisdiction challenges were rather cursory. The BOR contends that neither the FPASA, the Declaratory Judgment Act nor the mandamus statute confer jurisdiction upon this court. Of course, as just shown, plaintiffs are not relying upon either of those first two statutes as a basis for jurisdiction herein. More to the point, BOR accurate-

---

6. Although styled as a motion for "summary judgment," Part. Mot. (Doc. 110) at 1:2, like plaintiffs, Partners are seeking only partial summary judgment as their motion is directed only at count one.

ly states that "[j]urisdiction must come from a source other than the APA." BOR Resp. (doc. 113) at 12:12–13 (citations omitted). For that reason, and disregarding the possibility of federal question jurisdiction, the federal defendants raise the specter that subject matter jurisdiction is lacking here. Partners challenges subject matter jurisdiction in a different way.[7] Implying without any analysis or discussion that count one is actually a "bid protest," Partners asserts that jurisdiction lies with the Court of Federal Claims pursuant to the Tucker Act, as amended by the Administrative Disputes Resolution Act ("ADRA"), 28 U.S.C. § 1491(b). Part. Mot. (doc. 110) at 5:22. Accordingly, Partners properly seek "dismiss[al][,]" *id.* at 6:2, as opposed to summary judgment, for lack of subject matter jurisdiction. *See California Save Our Streams Council v. Yeutter,* 887 F.2d 908, 913 (9th Cir.1989) (citation omitted) ("Summary judgment is an inappropriate disposition when the district court lacks [subject matter] jurisdiction."); *see also Smith v. United States,* 1999 WL 33318819, at *1 (D.Ariz. March 11, 1999) ("Although Defendant raises the issue of subject matter jurisdiction in a motion for summary judgment, the court will treat the motion as one suggesting dismissal based on lack of subject matter jurisdiction because the court cannot enter judgment but rather only dismiss the complaint if it lacks subject matter jurisdiction."), *aff'd,* 1999 WL 793695 (9th Cir. 1999).

Plaintiffs' first response is procedural. Plaintiffs contend that because the defendants admitted jurisdiction in their answers, they are now "bound" by those "admissions[.]" *See* Pl. Resp. (doc. 133) at 9:12 (citation omitted). Defendants did expressly admit jurisdiction in their respective answers. *See* Part. Ans. (doc. 14) at 1–2, ¶ 2; and BOR Ans. (doc. 42) at 2, ¶ 2. As explained below, however, those "admissions" are insufficient to confer subject matter jurisdiction upon this court, assuming it is otherwise lacking.

 It is beyond peradventure that " '[t]he jurisdiction of the federal courts ... is a grant of authority to them by Congress and thus beyond the scope of litigants to confer.' " *U.S. Fidelity & Guar. Co. v. Lee Investments LLC,* 551 F.Supp.2d 1069, 1079 (E.D.Cal.2008) (quoting *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 167, 60 S.Ct. 153, 84 L.Ed. 167 (1939)). In other words, defendants cannot agree to or admit subject matter jurisdiction absent a Congressional grant of jurisdiction to this court. Second, notwithstanding defendants' admissions, "lack of subject matter jurisdiction is never waived[,]" and indeed "may be raised by the court *sua sponte* at any juncture." *Harrison v. Howmedica Osteonics Corp.,* 2008 WL 615886, at *1 (D.Ariz. March 3, 2008) (citing *Attorneys Trust v. Videotape Computer Products, Inc.,* 93 F.3d 593, 594–595 (9th Cir.1996)). In light of the foregoing, plaintiffs' argument that defendants cannot challenge jurisdiction because

---

7. After stating the general premise that "[t]he Federal Court of Claims has ... Jurisdiction," Partners claim that "venue" is not "proper" in this court. Part. Mot. (doc. 110) at 5:21. " '[V]enue is not jurisdictional[,]' " however. *Morales v. Willett,* 417 F.Supp.2d 1141, 1142 (C.D.Cal.2006) (quoting *Libby, McNeill & Libby v. City National Bank,* 592 F.2d 504, 510 (9th Cir.1978)). Indeed, " 'jurisdiction must be first found over the subject matter and the person before one reaches venue[.]' " *Parke v. Cardsystems Solutions, Inc.,* 2006 WL 2917604, at *2 (N.D.Cal. Oct. 11, 2006) (quoting *Bookout v. Beck,* 354 F.2d 823, 825 (9th Cir.1965)). Thus, because venue and subject matter jurisdiction are two distinct concepts, they cannot be used interchangeably. The court construes Partners' argument as raising strictly a jurisdictional challenge.

of the "admissions" in their answers, is wholly without merit.

Plaintiff's second response to defendants' jurisdictional challenges is that the Tucker Act "only applies to claims for money damages[,]" and they are seeking declaratory and injunctive relief. Pl. Resp. (doc. 122) at 9:18–19 (citations omitted). Hence, plaintiffs reason, subject matter jurisdiction properly lies in this district court. Indeed, plaintiffs go so far as to state that "[t]he Court of Federal Claims 'does not have the authority to issue a declaratory judgment.'" *Id.* at 9:22–23 (quoting *Justice v. Lyng*, 716 F.Supp. 1567, 1569 (D.Ariz.1988)).

Plaintiffs are conveniently overlooking the fact, however, that the Tucker Act was amended by ADRA in 1996. The ADRA enlarged the jurisdiction of the Court of Federal Claims, as well as expressly authorizing that Court to "award any relief that [it] considers proper, *including declaratory and injunctive relief*[.]" 28 U.S.C. § 1491(b)(2) (West 2006) (emphasis added). Thus, plaintiffs cannot circumvent the jurisdiction of the Court of Federal Claims based upon the nature of the relief which they are seeking. *See Advanced Systems Technology, Inc. v. Barrito*, 2005 WL 3211394, at *6 (D.D.C. Nov. 1, 2005) (finding that because section 1491(b)(1) of the ADRA allows for awards of declaratory and injunctive relief, the fact that plaintiff sought only such relief did not provide a basis for district court jurisdiction). Moreover, the Tucker Act's 1996 amendment means that plaintiffs' reliance upon cases such as *Justice*, decided well before that enactment, is misplaced.

■ The APA is the statutory basis for plaintiffs' claim that the BOR's alleged violations of the FPASA are subject to judicial review. The APA provides that in most circumstances, "[a]n action in a court of the United States seeking relief other than money damages … shall not be dis-

missed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702 (West 2007). Citing to the seminal case of *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the BOR accurately states that the APA does not provide an independent jurisdictional basis for reviewing agency actions.

■ Plaintiffs are also relying upon the federal question statute, 28 U.S.C. § 1331, as a jurisdictional basis though. Section 1331 grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (West 2006). As plaintiffs are quick to point out, the *Califano* Court explained that section 1331 "confer[s] jurisdiction on federal courts to review agency action, *regardless* of whether the APA of its own force may serve as a jurisdictional predicate." *Califano*, 430 U.S. at 105, 97 S.Ct. at 984 (emphasis added); *see also ANA Intern., Inc. v. Way*, 393 F.3d 886, 890 (9th Cir.2004) (citation omitted) ("The default rule is that agency actions are reviewable under federal question jurisdiction, pursuant to 28 U.S.C. … § 1331 and reinforced by the enactment of the … APA, even if no statute specifically authorizes judicial review.") After "not[ing] that agency actions are generally reviewable under federal question jurisdiction, pursuant to 28 U.S.C. § 1331," the Ninth Circuit in *Spencer Enterprises, Inc. v. U.S.*, 345 F.3d 683 (9th Cir.2003), offered the following rationale:

> Even if no statute specifically provides that an agency's decisions are subject to judicial review, the Supreme Court
>> customarily refuse[s] to treat such silence as a denial of authority to [an] aggrieved person to seek appropriate relief in the federal court, … and this custom has been reinforced by the

enactment of the [APA], which embodies the basic presumption of judicial review to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.

*Id.* at 687–88 (internal quotation marks and citations omitted). The foregoing convinces the court that it has subject matter jurisdiction under section 1331, "reinforced by" the APA, *see ANA Intern.,* 393 F.3d at 890, to consider whether BOR acted arbitrarily, capriciously and abused its discretion as the FAC alleges.

■ The court's jurisdictional analysis cannot end here though. That is because the claims herein are against the United States, *i.e.,* the BOR. As a sovereign the United States "is immune from suit unless it has expressly waived such immunity and consented to be sued." *McGuire v. U.S.,* 550 F.3d 903, 910 (9th Cir.2008) (internal quotation marks and citation omitted). "Such waiver cannot be implied, but must be unequivocally expressed." *Id.* (internal quotation marks and citation omitted). Accordingly, even if jurisdiction is proper under section 1331, still, there must be an explicit waiver of sovereign immunity. *See id.* (internal quotation marks and citation omitted) ("Where a suit has not been consented to by the United States, dismissal of the action is required ... [because] the existence of such consent is a prerequisite to jurisdiction.") Plaintiffs did not consider this sovereign immunity issue and BOR only alludes to it. Because a waiver of sovereign immunity is an essential part of the court's subject matter jurisdiction in this case, however, the court must carefully consider that issue.

## A. Waiver of Sovereign Immunity

Section 1331 is an undeniably broad jurisdictional grant, but in and of itself that statute is not a waiver of sovereign immu-

nity. *Pit River Home and Agr. Co-op. Ass'n v. U.S.,* 30 F.3d 1088, 1098 n. 5 (9th Cir.1994) (citations omitted); *see also Hughes v. U.S.,* 953 F.2d 531, 539 n. 5 (9th Cir.1992) (citations omitted). Consequently, this court has subject matter jurisdiction under section 1331 only if there is separate statutory waiver of sovereign immunity, which here means returning to the APA.

■ The APA contains a limited waiver of sovereign immunity. "[S]ection 702 of the APA waives sovereign immunity for Plaintiffs' claims if (1) the claims are not for money damages; (2) an adequate remedy for the claims is not available elsewhere; and (3) the claims do not seek relief expressly or impliedly forbidden by another statute." *Grant County Black Sands Irr. Dist. v. U.S.,* 539 F.Supp.2d 1292, 1296 (E.D.Wash.2008) (citing *Tucson Airport Authority v. General Dynamics Corp.,* 136 F.3d 641, 644 (9th cir.1998)). Plaintiffs' claims herein satisfy all three prongs of this test, as more fully explained below.

### 1. "Money Damages"

Plaintiffs are not seeking monetary relief in this case; they are seeking declaratory and injunctive relief, as noted earlier. Consequently, there is no dispute that the first element of the APA's limited waiver of sovereign immunity is met here.

### 2. Adequate Remedy Not Available Elsewhere

Partners maintains that the Tucker Act as amended by the ADRA vests exclusive jurisdiction in that Court. Framed in terms of sovereign immunity, if an adequate remedy is available in the Court of Federal Claims under the ADRA, then plaintiffs would not be entitled to rely upon the APA's limited waiver of sovereign immunity. *See Fire–Trol Holdings*

*L.L.C. v. U.S. Dep't of Agriculture Forest Service,* 2004 WL 5066232, at *4 (D.Ariz. Aug. 13, 2004) (because plaintiff "alleges the violation of a statute or regulation in connection with a proposed procurement, under the ADRA, the Court of Federal Claims ha[d] exclusive jurisdiction[,]" thus "preempt[ing]" the court's § 1331 jurisdiction and the APA's waiver of sovereign immunity), *aff'd in part, rev'd in part on other grounds without pub'd opinion,* 209 Fed.Appx. 625 (9th Cir.2006). Conversely, if an adequate remedy is not available in the Court of Federal Claims, then the second element necessary to establish a waiver of sovereign immunity under the APA is present here.

Whether an "adequate remedy is available" in the Court of Federal Claims necessarily implicates that Court's jurisdiction in the first instance. Section 1491(b)(1) provides in relevant part that the United States Court of Federal Claims:

> [S]hall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (West. 2006).[8] In arguing the merits, the parties vigorously dispute whether the UMA or the RMA are "procurement" contracts. They did not specifically address the "interested party" or "Federal agency" aspects of section 1491(b)(1). For the sake of completeness, the court will address all three factors.

### a. "Interested Party"

A concrete definition for "interested party" under section 1491(b)(1) has "yet [to be] precisely ... delineated[.]" *Phoenix Air Group, Inc. v. United States,* 46 Fed. Cl. 90, 102 (Fed.Cl.), *appeal dismissed per stipulation,* 243 F.3d 555 (Fed.Cir.2000). "Without an explicit definition, previous Court of Federal Claims decisions have found that, to be an 'interested party' under the Tucker Act, a plaintiff must stand in some connection to the procurement, and it must have an economic interest in it." *Id.* (internal quotation marks and citation omitted). Given this broad interpretation, it is possible to find that plaintiffs Maule–Ffinch and Pensus (the only plaintiffs which count one names), are "interested parties" for purposes of section 1491(b)(1). They stood "in some connection to the procurement" in that, as a marina developer and operator in the area, they wanted to respond to the 2005 RFP (although they believed that section 6.8 precluded them from so doing). Those plaintiffs also had an economic interest in the "procurement," because an award of the UMA to them, rather than to Partners, obviously would have inured to their financial benefit.

Under the terms of the Pleasant Harbor lease, Partners maintains that plaintiffs were not qualified bidders because supposedly that lease prohibited plaintiffs from basically operating a competing marina, such as Scorpion Bay. Plaintiffs are correct that Partners selectively quoted from that lease. Immediately following that seemingly prohibitive language, the lease lists the "conditions" under which the lessor was required to permit plaintiffs to

---

8. Consideration of whether this action comes within the scope of the ADRA is imperative for the additional reason that "where a case falls under Tucker Act [ADRA] jurisdiction, federal question jurisdiction[,]" which plaintiffs herein are invoking, "cannot serve as an alternative basis for jurisdiction." *Marceau v. Blackfeet Housing Authority,* 455 F.3d 974, 986 n. 6 (9th Cir.2006).

engage in a competing marina business. Pl. Resp. (doc. 26) at 1–2 (citation omitted). There is no need at this juncture to become mired down in the discrete issue of whether that lease barred plaintiffs from bidding on the 2005 RFP, especially because Partners did not raise that issue in the context of section 1491(b)(1).

■ For present purposes, the court is hesitant to adopt a strict and narrow view of an "interested party" under that statute. This hesitancy stems in part from how broadly the Court of Federal Claims has construed "interested party." *L–3 Communications EOTech, Inc. v. United States,* 85 Fed.Cl. 667 (2009), is illustrative. There the court "held that protestors had standing to protest the agency action, even though there was no solicitation by the agency for which they could compete." *Id.* at 673 (citation omitted). That holding is representative of the broad parameters of the "interested party" element of section 1491(b) (1). Thus, the court finds that plaintiffs Maule–Ffinch and Pensus are "interested parties" within the meaning of that statute.

### b. *"Federal Agency"*

The next jurisdictional prerequisite under the ADRA is a showing that plaintiff "competed in a government-sponsored solicitation, which was issued by a federal agency and not a private party." *Blue Water Envt'l, Inc. v. U.S.,* 60 Fed.Cl. 48, 51 (2004). That is because the Court of Federal Claims "has no authority over non-Federal entities." *Id.* (internal quotation marks and citation omitted). Thus, unless the soliciting entity is federal or "acting as an 'agent' for a federal entity[,]" jurisdiction under § 1491(b)(1) of the ADRA is lacking. *See id.*

The ADRA does not define "federal agency." *Novell, Inc. v. U.S.,* 46 Fed.Cl. 601, 606 n. 3 (2000). However, it "[i]s is well-settled that for purposes of determin-

ing Tucker Act jurisdiction, the definition of 'agency' in 28 U.S.C. § 451 is controlling." *Blue Water Envt'l,* 60 Fed.Cl. at 51. That statute's definition of agency " 'includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest unless context shows that such term was intended to be used in a more limited sense.' " *Id.* at 51–52 (quoting 28 U.S.C. § 451).

In count one, plaintiffs allege a "prima face violation of federal procurement law" arising from BOR's "approval of the Proposed UMA, which was based on the illegal 2005 RFP." FAC (doc. 4) at 18, ¶¶ 83 and 84. That RFP allegedly was "illegal" because it "violated the principle of full and open competition reflected in federal procurement law" in several ways. *Id.* at 17, ¶ 80; and at 18, ¶ 83. The 2005 RFP was issued by Maricopa County, however. Therefore, on the face of it, the underlying solicitation which forms the basis for count one was not issued by a federal agency under section 451's definition.

Nonetheless, the court must consider whether the County was "acting as 'agent' for a federal entity[,]" *i.e.* so as to confer "Federal agency" status upon the County within the meaning of section 1441(b)(1). In *Blue Water Envt'l,* the court discussed two possible theories which could render a non-federal entity a "Federal agency" with the meaning of that statute—"day-to-day supervision" and "purchasing agent[.]" *Blue Water Envt'l,* 60 Fed.Cl. at 51 and 53. The court in *Blue Water Envt'l* held that a private contractor, Brookhaven Science Associates ("BSA"), which operated a national laboratory owned by the Department of Energy ("DOE") pursuant to a contract with DOE, was not a "Federal agency" under either theory. Thus, it dis-

missed the complaint for lack of subject matter jurisdiction.

BSA, the private contractor in *Blue Water Envt'l*, issued a series of RFPs which ultimately resulted in a contract between it and another private· entity to perform remediation at the laboratory site. A "disappointed proposer[ ]" filed suit against the DOE claiming that BSA "illegally, arbitrarily and capriciously ... review[ed] the proposals under the [RFP], and violated the law by awarding the [clean-up] contract" to another entity. *Id.* at 50 (internal quotation marks omitted).

On its motion to dismiss for lack of subject matter jurisdiction under § 1491(b)(1), the DOE argued that BSA was not a "Federal agency" within the meaning of that statute. Plaintiff attempted to establish that the BSA was a "Federal agency" because it was "managing and operating a government facility under the day-to-day supervision of the Federal Government." *Id.* at 52. Rather than examining that broader alleged supervision, the court narrowed its inquiry to whether "the BSA was an 'agency' under a day-to-day supervision theory in connection with the subject procurement." *Id.* Finding that "DOE was removed from day-to-day supervision of the subcontracting process at issue[,]" and that it did not "control[ ]" that process, the court held that even if "plaintiff's day-to-day supervision theory [wa]s sufficient to establish 'agency' for purposes of the Tucker Act, the plaintiff ... failed to establish that DOE supervised or directed the subcontracting process in th[at] case." *Id.* at 52–53. Therefore, the court found that BSA was not a "Federal agency" as section 1491(b)(1) uses that phrase.

Several factors weighed in the *Blue Water Envt'l* court's determination that "BSA acted independently from DOE[.]" *Id.* at 52. First, the court pointed to the absence of consultations between BSA and DOE in terms of "selecting and awarding the sub-

contract" at issue. *Id.* Second, neither DOE's contracting officer nor his staff "participate[d] in the subcontracting process[.]" *Id.* Third, DOE did not "exercise any control over" that subcontracting process as is evidenced in part by the fact that DOE "did not review the ... project solicitation or contract[.]" *Id.* (internal quotation marks omitted). In light of the foregoing, the *Blue Water Envt'l* court found that "DOE was·removed from day-to-day supervision of the subcontracting process[.]" *Id.* Thus, the court ·declined to find that BSA was acting as a "federal entity for purposes of the subject procurement." *Id.*

 The present case stands in sharp contrast to *Blue Water Envt'l*. Far from "act[ing] independently" from BOR, BOR had significant involvement in the RFP process which is the basis for count one. *See id.* The 2005 RFP was preceded by RFPs in 2002 and 2004. Those earlier two RFPs were remarkably similar to the 2005 RFP, but unlike that RFP, the earlier two RFPS never came to fruition. So even though count one refers only to the 2005 RFP, the court cannot ignore BOR's involvement with the marina project over the years, up through its approval of the Final UMA in 2005.

BOR was heavily involved in the decision-making process with respect to the marina project, unlike the private contractor in *Blue Water Envt'l*. The County did not undertake that process on its own. There was extensive interplay between the County and BOR as to the 2002 RFP. In 2002, the County submitted at least two draft RFPs to BOR. Admin. Rec., Vol. 1 at 000158. On May 13, 2002, BOR received an RFP from the County for BOR's "review and approval[.]" *Id.* Although BOR approved the May 2002 RFP, on September 25, 2002, BOR received from the County an "amended copy" of the 2002 RFP. *Id.*

A couple of months later, a BOR e-mail shows that BOR questioned whether "the County changed something after our [BOR's] approval." *Id.* That e-mail further states that BOR would "never have agreed to the language in Article 6.2 *Competition, Non–Conclusion [sic] & Conflict of Interest.*" *Id.*

Other internal BOR communications provide further indica that unlike *Blue Water Envt'l,* BOR was not "removed from day-to-day supervision" of the RFP process through the years. *See Blue Water Envt'l,* 60 Fed.Cl. at 52. Although it seems that from the outset BOR viewed the inclusion of the "competition" clause as problematic, by March, 2003, BOR had somewhat allayed its concerns, noting that it "and the County [would] have some control over rates[.]" Admin. Re., Vol. 1 at 000159. Also in March, 2003, BOR "offer[ed]" to the County "to use the services of a review by the National Marina Operator's president[.]" *Id.*

Further evidence of the close working relationship between the County and BOR with respect to the marina RFP process is the County's offer to "let [BOR] into the current process[.]" *Id.* BOR "declined" at that time, but "[if] the bidder [wa]s determined to be valid, [BOR] [was to] be brought into th[e] process for *further* questioning on his plans and proposal." *Id.* (emphasis added).

BOR's involvement with the RFP process continued in the following years. On August 11, 2004, the County provided BOR with an RFP, asking for BOR's "review" and to "make any necessary comments on behalf of [BOR]." *Id.* at 255.2. BOR continued to express concern with inclusions of the "Competition" clause in that RFP. BOR noted its "total disagree[ment]" with that language because "not only" does it "violate the competitive bid process, but it also eliminates the owners of commercial operations 'near' LPRP." *Id.* at 255.1.

BOR further observed that it "appear[ed] from the contents of the recent RFP that [the County]" did not take "advice" from BOR, among others. *Id.*

The court cannot stress enough that at this juncture, the import of these BOR communications is *not* in how BOR purportedly viewed the "competition" clause, but BOR's awareness of it in the first place. BOR's awareness that the County was including that clause shows that BOR was quite closely monitoring those RFPs. Indeed the documents quoted above, taken together, give the distinct impression that BOR and the County were engaged in somewhat of a collaborative effort in terms of the RFP process. The County would provide BOR with a draft RRP; BOR would review it and comment and return it to the County for revision. The process would continue until BOR approved the RFP.

In addition to being part of the RFP process, in sharp contrast to BSA which did not "exercise any control" over the subcontracting process in *Blue Water Envt'l,* here, BOR exercised ultimate control. The RMA vested the prerogative of final approval rights in the BOR. Under the express terms of the RMA, agreements such as the UMA, were "[s]ubject to the final approval of" BOR. Admin. Rec., Vol. 1 at 000016. Another provision of the RMA includes an express retention by BOR of the "right of final approval" over all agreements such as the UMA. *Id.* at 00018.

Additionally, the Administrative Record makes clear that BOR actually exercised the approval authority which it had under the RMA. In a November 14, 2005, letter BOR "indicat[ed] [its] agreement in principle" to the UMA. *Id.* at 000162. In that letter, BOR advised the County that it had "reviewed [the County's] most recent draft [UMA] between ... [the] County and

[Partners], . . ., for the development of the . . . Marina." *Id.* at 000160. BOR further stated that "[f]inal review and approval of this contract will be provided after minor corrections are addressed and legal review has been completed." *Id.* That letter continued, noting that the draft UMA "accurately state[d] that various activities during both the developmental phase and the operational phase of this project will Require [*BOR*] *approval.*" *Id.* (emphasis added). BOR "reiterate[d] the importance of abiding by th[o]se requirements[.]" *Id.* Consistent with the foregoing, BOR noted that the draft UMA needed to be "correct[ed] . . . to add [BOR] as an approving entity" for a certain potential use. *Id.* After listing "[k]ey areas requiring [BOR] approval[,]" BOR advised the County of BOR's "require[ment]" for advance funding for certain administrative costs. *Id.*

Furthermore, while BOR agreed that as part of the UMA, Partners could be offered a "right of first refusal for the potential use" of certain "Highway . . . frontage[,]" BOR expressly conditioned that approval upon [BOR] developing and executing an Amendment with the County to the [RMA] for th[o]se uses." *Id.* at 000161. Among other things that amendment would "provide for a long term revenue sharing agreement between" BOR and the County. *Id.* In the penultimate sentence of that letter, BOR informed the County that "[o]nce legal review is complete," it would "provide . . . formal approval" of the UMA. *Id.* Lastly, the County was instructed to contact BOR if it had "any further questions." *Id.*

In a second letter, dated December 6, 2005, BOR informed the County that it had "completed [its] final review of the [proposed UMA], including [the County's] most recent changes[.]" *Id.* at 00162. BOR found the proposed UMA "acceptable" in that form. *Id.* Again, BOR closed that letter by indicating the if the County

had "any further questions[,]" it could contact the BOR staff person named therein. *Id.*

As detailed above, BOR had an integral role in the RFP process; it was not merely rubber-stamping those RFPs. BOR actively participated nearly every step of the way in the process which culminated in the Final UMA. It reviewed the RFPs and the proposed UMA. BOR attempts to distance itself from its final approval authority by stressing that the RMA did not require that it give final approval to the RFPs, only to the UMA itself. In that regard, BOR notes that "[b]oat storage/both wet and dry/boat repair and sales[,]" and "[s]upply stores/including boat equipment" are specifically enumerated in the "pre-approved list of potential public recreational uses for LPRP third party concession agreements[.]" *Id.* at 000017. Reliance upon the fact that the marina was on the "pre-approved" list of potential uses ignores the reality of BOR's involvement. On the record as presently constituted, BOR's heavy involvement in the RFP process, culminating in approving the Final UMA, is readily apparent. Given its retention of broad "final approval" rights over the UMA, if BOR was not satisfied with any aspect of that Agreement, including the RFP process, it could have withheld final approval; but it did not. Therefore, the court finds that the County was "acting as an 'agent' for a federal entity[,]" BOR, within the meaning of section 1491(b)(1). *See Blue Water Envt'l,* 60 Fed.Cl. at 51.

### c. *Violation in Connection with Procurement*

Having found the plaintiffs Pensus and Maule–Ffinch are "interested parties" and that the County was acting as an agent for BOR, the next step in analyzing section 1491(b)(1) is whether plaintiffs are claiming "any alleged violation of statute or

regulation in connection with a procurement or proposed procurement[ ]" in count one. *See* 28 U.S.C. § 1491(b)(1). The "in connection with" language, which the Federal Circuit has observed is the "operative phrase," is "very sweeping in scope." *RAMCOR Serv. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999). "[A] statute is 'in connection' with a procurement, or a proposed procurement, '[a]s long as [the] statute has a connection to a procurement proposal.'" *Rhinocorps Ltd. Co. v. United States,* 85 Fed.Cl. 712, 717 (2009) (quoting *RAMCOR,* 185 F.3d at 1289). "The clause ["in connection with"] 'does not require an objection to the actual contract procurement.'" *Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia,* 489 F.Supp.2d 30, 38 (D.D.C.2007) (quoting *RAMCOR,* 185 F.3d at 1289). "Thus, a 'statute or regulation in connection with a procurement or a proposed procurement' includes, by definition, a regulation in connection with any stage of the federal contracting acquisition process, including 'contract completion and closeout.'" *Id.* Likewise, "the Federal Circuit [has] held that a statute is 'in connection with a procurement' where 'an agency's actions under a statute ... clearly affect the award and performance of a contract.'" *Id.* (quoting *RAMCOR,* 185 F.3d at 1289).

*Phoenix Air Group, supra,* is particularly instructive given that the plaintiff therein alleged violations of the Armed Services Procurement Act ("ASPA"), which is "almost identical" to the FPASA—the primary basis for count one herein. *See id.* at 101, n. 12 (citation omitted). The ASPA requires, like other statutes, that "government agencies conducting procurements must obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation[s] [ ("FAR") ][.]" *Id.* at 101 (internal quotation marks and citation omit-

ted). After noting the "sweeping scope" of the phrase "in connection with," the *Phoenix Air Group* court held that allegations that defendant violated the ASPA by "sole-source acquisition of training flight services ... without any competition[,]" was "sufficient to satisfy the portion of the jurisdictional requirements [of section 1491(b)(1) ] relating to a 'violation of statute or regulation.'" *Id.*

In the present case, the statutory basis for count one is the FPASA, and related regulations. Quoting several regulations requiring *"full and open competition"* in "[a]ll procurement transactions[,]" FAC (doc. 4), at 15, ¶¶ 63 and 66 (emphasis in FAC), plaintiffs are seeking a declaration, *inter alia,* that defendants violated "FPASA by failing to ensure compliance with federal procurement law by [the County], and authorizing the Proposed UMA based on the illegal 2005 RFP[.]" *Id.* at 26, Prayer for Relief, at ¶ 1. Given that the FPASA is "almost identical" to the ASPA, and that plaintiffs herein are relying upon essentially the same "full and open competition" requirements at issue in *Phoenix Air Group,* the court has little difficulty finding that alleged violations of the FPASA and related regulations satisfy the "portion of the jurisdictional requirements relating to a 'violation of a statute or regulation'" under section 1491(b)(1). *See Phoenix Air Group,* 46 Fed.Cl. at 101; and at 101 n. 12.

That does not end the court's inquiry, however. In fact, in some respects that is just the starting point because "[m]uch depends ... on the meaning of the term 'procurement'"—another term which the ADRA does not define. *Public Warehousing,* 489 F.Supp.2d at 38. Nor, for that matter, do the FARs define procurement. Instead, after the listing for "procurement[,]" the FARs directly refer to the definition of " 'acquisition' " therein. *See* 48

C.R.F. 2.101(b). However, "[t]he Court of Federal Claims has construed 'procurement' as used in section 1491(b)(1) to encompass 'all stages of the process of *acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout,' borrowing from Congress's definition of the term procurement at 41 U.S.C. § 403(2)." *Public Warehousing,* 489 F.Supp.2d at 38 (citations and footnote omitted) (emphasis added).

Section 403(2) does not define "acquiring," but the FARs are instructive. Section 2.101(b)(2) defines acquisition as follows:

> the acquiring by contract *with appropriated funds of supplies or services* (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.

48 C.F.R. § 2.101(b)(2) (emphasis added). That FAR further defines "supplies" as "all property *except* land or interest in land." *Id.* (emphasis added). Among other things, "supplies" "include[ ] (but is not limited to) public works, buildings, and facilities; ships, [and] floating equipment ...; and the alteration or installation of any of the foregoing." *Id.* The FARs do not define services.

The parties vigorously dispute, albeit in the merits context, whether the RMA and the UMA are procurement contracts. There is no reason to believe that the parties would not advance these same arguments in considering whether plaintiffs can avail themselves of the APA's sovereign immunity waiver. The court will proceed on that assumption.

Plaintiffs are seeking a declaration that defendants violated the FPASA by "authorizing the Proposed *UMA* based on the illegal 2005 RFP." FAC (doc. 4) at 26, Prayer for Relief, at ¶ 1 (emphasis added). Ultimately, plaintiffs are seeking to have this court "[s]et aside the [Final] 2005 *UMA* [.]" *Id.* at 27, Prayer for Relief, at ¶ 8 (emphasis added). Thus, for the moment, the court will confine its analysis to whether the UMA, as opposed to the RMA, is a procurement contract, so as to bring it within the ambit of section 1491(b)(1).

BOR contends that the UMA is not a procurement contract; it is a concession contract. Expressly distinguishing concession from procurement contracts, the Court of Federal Claims has explained that the former operates as "a grant of a permit to operate a business and the Government is not committing to pay out government funds or incur monetary liability." *Frazier v. United States,* 67 Fed.Cl. 56, 59 (2005) (internal quotations and citations omitted), *aff'd without pub'd opinion,* 186 Fed.Appx. 990 (C.A.Fed.2006). BOR maintains that the UMA easily fits within that definition. Additionally, BOR reasons that the UMA cannot be deemed a procurement contract because it did not "require[ ] or obligate[ ] the expenditure of federal appropriated funds or involve[ ] the acquisition of property, services, or construction for the federal government or even the County." BOR Resp. (doc. 113) at 17:27–18:1.

Begging the issue, in their reply plaintiffs simply contend that "BOR's mandatory [D & Ss] require that concessions by non-federal partners comply with federal law, and make no exceptions for federal procurement law." Pl. Reply (doc. 188) at 5:22–24. Plaintiffs never explain how the UMA can be considered a procurement within the meaning of the applicable statutes, regulations or case law, however.

██ Examination of the UMA shows that it is not a procurement contract. Nei-

ther the County nor BOR acquired property under the UMA. Regardless of the definition of "services," the "public at large" acquired the "services" rendered thereunder—not the County and not BOR. Admin. Rec., Vol. 1 at 000167 (stating that the parties were entering into that agreement "to provide dry stack storage, watercraft rentals, boating supply store and other related services to the public at LPRP").[9] Further, under the UMA neither the County nor BOR are committed to paying out any government funds. The funds flowed the opposite way; Partners is obligated to pay the County a percentage of gross receipts. *Id.*, Vol. 1 at 000168–000170.

Likewise, neither BOR nor the County incurred any monetary liability under the UMA. Moreover, the UMA mandates that Partners shall "indemnify and hold harmless" both the County and BOR. *Id.*, Vol. 1, at 000186 at ¶ 21(A). The UMA also mandates that Partners include both the County and BOR as " 'additional insureds' under all policies of insurance." *Id.*, Vol. 1 at 000188, ¶ 21(B)(4)(a). These provisions severely restrict if not avoid altogether the possibility of either the County or BOR incurring any monetary liability under the UMA. Thus the fundamental hallmarks of a procurement contract are missing from the UMA.

Bolstering the conclusion that the UMA is a concession contract is the language which that agreement employs. The UMA is replete with references to concession in its various forms. For example, Partners is referred to throughout as the "CONCESSIONAIRE." *See* Admin. Rec., Vol. 1 at 000166–000203 (emphasis in original). "General Provisions" in the UMA specifi-

cally describe the "Concession Granted[.]" *Id.*, Vol. 1 at 000167, ¶ 1. The UMA also specifically refers to BOR's "Directives and Standards ["D & Ss"] as identified in exhibit B" thereto. *Id.*, Vol. 1 at 000167. The "subject" of those particular D & Ss is *"Concessions* Management by Non–Federal Partners[.]" *Id.*, Vol. 1 at 000150 (emphasis added). Somewhat tellingly, at the same time plaintiffs are strenuously arguing that this is a procurement action, they sometimes refer to the UMA as a "concession agreement." *See, e.g.*, Pl. Reply (doc. 118) at 2:18–19.

The court hastens to add that use of the word "concession" or "concessionaire" is not alone dispositive of the nature of the UMA. After all, any agreement could be denoted a "concession agreement." Rather what governs here is the nature of the UMA, which clearly granted Partners permission to develop, operate and maintain a marina at LPRP, without any expenditure of government funds. Having found that the UMA is a concession contract, necessarily, the Court of Federal Claims would not have jurisdiction under section 1491(b)(1) over any claimed statutory or regulatory violations "in connection with" the UMA.

The court cannot disregard plaintiffs' argument, however, that the RMA, which authorized the County to enter into the UMA, is a procurement contract. Vigorously contending that the RMA is a procurement contract, plaintiffs tacitly assume that so, too, is the UMA. The court has serious reservations as to this line of reasoning. But again, to be thorough, and because the BOR and plaintiffs devoted a

---

9. The court realizes that the Administrative Record contains what purports to be the December 6, 2005 "Final Version" of the UMA, and the FAC is quoting from a October 19, 2005 "Draft" version. *See* FAC, exh. I there-

to. The language quoted herein is the same in both versions, however, so for present purposes it matters not that the Administrative Record contains the "Final Version," but the FAC is relying upon a "Draft" version.

fair portion of their briefs to this issue, the court will address it as well.

Plaintiffs point to several aspects of the RMA which they believe establish that it is a procurement contract. First, they stress that BOR acquired property from the County under the RMA. The County "transfer[red] to" BOR, *inter alia*, "any and all incorporeal property interests of said County in the existing park lands, and *facilities*, including any purported water rights ...; and any and all fixtures or improvements in such lands which have not been otherwise acquired by [BOR]." Admin. Rec., Vol. 1 at 000007, Art. 4(a) (emphasis added). Plaintiffs further explain that in accordance with the RMA, "[a]s full and complete consideration" for transfer of those property interests, BOR granted the County, *inter alia*, "the exclusive right ... to manage for public recreational uses the lands and waters thereon ... as Federal LPRP land manager." *Id.*, Vol. 1 at 000007, at Art. 4(c)(3). That consideration also included BOR granting authority to the County to "enter into third party concession agreements[.]" *Id.*, Vol. 1 at 000008, Art. 4(c)(4). In addition to the foregoing consideration, BOR paid the County $2.5 million which, from plaintiffs' standpoint, was "in exchange for the County providing *services* in the form of management of BOR land." Pl. Reply (doc. 118) at 5:16–17 (emphasis added). The County was to "utilize[ ]" those monies "*only* in connection with the *recreational development* of the LPRP wherein [BOR] has Federal land management responsibility[,]" however. Admin. Rec., Vol. 1 at 000008, Art. 4(c)(6) (emphasis added). Therefore, the County was not receiving payment for rendering management services *per se.*

Plaintiffs further rely on one cost-sharing provision of the RMA which they believe demonstrates that it is a procurement contract. In that provision, the County and BOR agreed to "share costs ... for the development of the LPRP for public recreational uses." *Id.*, Vol. 1 at 000005 at Art. 2(d). Lastly, plaintiffs note that "any development of LPRP lands subject to the third party concession agreement ... may be completed at [the] ... County's sole cost and expense" provided BOR has given its prior approval. *Id.*, Vol. 1 at 000011, Art. 6(b). Plaintiffs highlight the fact that that provision further states that "[u]pon termination of th[e] [RMA], title to such facilities shall be vested in [BOR] unless otherwise noted in [BOR]'s approval of the development of such Facilities." *Id.* Although unstated, evidently it is plaintiffs' position that that possible future vesting of title amounts to BOR acquiring certain facilities pursuant to the RMA.

BOR strongly disagrees with plaintiffs' characterization of the RMA as a procurement contract. BOR counters that none of the aspects of the RMA upon which plaintiffs are relying establish that it is a procurement contract. Essentially, it is BOR's position that it did not "acquire" anything from the County pursuant to the RMA. BOR explains that the management right which it granted the County under the RMA was "as partial consideration for the County's property transfer to [BOR]." Fed. Def. Reply (doc. 134) at 7:20. Therefore, despite plaintiffs' assertion to the contrary, BOR maintains that that management right was "not a 'service' for which [it] was paying consideration." *Id.* at 7:21. BOR further asserts that the only "property" which it acquired was land, which is "excluded from federal procurement law." *Id.* at 7:24 (citing 48 C.F.R. § 2.101.) Nor were these monies to provide financial assistance to the County. As further support for this argument, BOR stresses that the RMA's transfer provisions, found in Article 4, are not incorporated in Article 2's recreational man-

agement provision, nor in the third-party concession provision of Article 13.

BOR also challenges plaintiffs' attempt to cast any of the RMA's cost sharing provisions as an acquisition, and hence a procurement. BOR explains that it did not "acquire" anything under those provisions. Rather, those cost sharing provisions "merely outline the circumstances under which some costs will be shared between [BOR] and the County[ ]" on a 50–50 basis. BOR Reply (doc. 134) at 8:3–4. Perhaps most notably, in accordance with the RMA, no federal funds or assistance were provided in connection with development of facilities such as the marina complex. The development was undertaken pursuant to the UMA—a third party agreement, with Partners bearing the cost.

As to the possible future vesting of title in BOR for "improvements built without federal assistance" under Article 6, which sets forth, *inter alia,* "LPRP Development Obligations[,]" BOR persuasively asserts that its "ability to potentially obtain improvements to the park under the contingencies noted in [that] article . . . can hardly fall within the definition of acquisition as noted in . . . FAR[,] 48 [C.F.R.] § 2.101." BOR Reply (doc. 134) at 8:15–18. Instead, BOR maintains that the RMA is, as its name indicates, nothing more than a management agreement, which is not synonymous with procurement.

In disputing whether the RMA is a procurement contract, the parties fail to take into account the entirety of what was transferred to BOR. BOR emphasizes that pursuant to Article 4 of the RMA, the County transferred land to it. This emphasis is understandable because, as previously mentioned, in defining supplies under the FARs, "land or interest in land" is expressly excluded from the definition of "supplies" which may be acquired by contract. *See* 48 C.F.R. § 2.101(b). There-fore, if, as BOR urges, the RMA exclusively involves a transfer of "and or interest in land," then the RMA would not be a procurement, as section .1491(b)(1) uses that term. Hence, the RMA would not be subject to federal procurement laws. Necessarily then, the Court of Federal Claims would lack jurisdiction under section 1491(b)(1) to consider any disputes pertaining thereto.

Significantly, however, the County transferred more than just land to the BOR under the RMA. As Article 4 states in its title, it pertains to the "[t]ransfer of [e]xisting [p]ark [*f*]*acilities* and [r]elated [p]roperty [i]nterests[.]" Admin. Rec., Vol. 1 at 000007, Art. 4 (emphasis added). Subarticle (a) explicitly states that the "County agrees to transfer to [BOR] . . . and [BOR] accepts . . . , any and all incorporeal property interests of said County in the existing park lands, and *facilities* [.]" *Id.,* Vol. 1 at 000007, Art. 4(a) (emphasis added). Subsection(c) of that Article 4 indicates that "[a]s full and complete consideration for [the] County's transfer of its property interests as set forth in subarticle (a) above, [BOR] shall provide[ ]" to the County, *inter alia,* $2.5 million. *Id.,* Vol. 1 at 000007 and 000008, Arts. 4(c) and 4(c)(6). Under the express terms of the RMA then, the County transferred to BOR not only land interests, but also facilities. Although land interests are exempt from the definition of "supplies" under the FARs, facilities are not, as noted earlier. Additionally, those facilities were obtained through the expenditure of appropriated funds, *i.e.,* "the authority of the Act of June 17, 1902 (. . . and all acts amendatory thereof and supplemental thereto, including the Colorado River Basin Project Act[.] )" *Id.,* Vol. 1 at 000008, Art. 4(c)(6). Consequently, although the land which the County transferred to the BOR is not a procurement, the facilities would be, ren-

dering the RMA a "procurement," at least partially.

■ At the end of the day though, the court is unwilling to hold that count one pertains to an "alleged violation of statute or regulation in connection with a *procurement* or a proposed *procurement.*" *See* 28 U.S.C. § 1491(b)(1) (emphasis added). The relationship between the RMA and the central issue in count one—alleged improprieties in the RFP process—is simply too attenuated to deem that count to be "in connection with a procurement." Put differently, although there is a procurement aspect to the RMA, that is not enough to bring the allegations of count one within the purview of section 1491(b)(1). The Court cannot ignore the reality that the "solicitation" of which plaintiffs are complaining in count one pertains solely to the UMA, which the court has found is a concession agreement.

At first glance, arguably count one of the FAC is a classic bid protest, as Partners contends, which would lie within the exclusive jurisdiction of the Court of Federal Claims. As should be patently obvious by now, one limitation on that Court's jurisdiction under section 1491(b)(1) of the ADRA is, as discussed above, the claim must be "in connection with a procurement or proposed procurement." Close scrutiny of the UMA, which is at the core of count one, reveals that it does not meet that criteria; indeed, it cannot because the UMA is a concession agreement—not a procurement agreement. Moreover, the fact that the RMA, from which the UMA emanates, is partially a procurement is not a sufficient basis upon which to find that count one alleges a violation of a statute "in connection with procurement." Because at a minimum the procurement element of section 1491(b)(1) is missing, the Court of Federal Claims is without jurisdiction to entertain count one. Thus, "an adequate remedy for ... [that count] is

not available elsewhere[,]" *i.e.* in the Court of Federal Claims. *See Grant County Black Sands,* 539 F.Supp.2d at 1296 (citation omitted). Hence, the second condition for showing a waiver of sovereign immunity under the APA also is met here....

### 3. *"Expressly of Impliedly Forbids"*

The third condition necessary to establish an APA waiver of sovereign immunity is the claims sought must not seek relief "expressly or impliedly forbid[den] by another statute." *See* 5 U.S.C. § 702. The parties do not even suggest, much less argue, that another statute forbids plaintiffs' claims in count one. It is possible to insinuate from defendants' argument, though, that because pursuant to the ADRA the Court of Federal Claims has exclusive jurisdiction over plaintiffs' count one claims, that Act "expressly or impliedly forbids" this court from exercising jurisdiction over those same claims. The court's reasoning in section I(A)(2) above as to the availability of adequate remedies elsewhere resolves this argument. Because the Court of Federal Claims lacks jurisdiction to entertain count one, it follows that the ADRA does not "expressly or impliedly" forbid those claims. Thus, because all three conditions necessary to establish waiver of sovereign immunity under the APA are satisfied, plaintiffs are entitled to rely upon that limited waiver.

### II. *Failure to Exhaust Administrative Remedies*

There is one additional argument which the court must address before turning to the merits—plaintiffs' alleged failure to exhaust administrative remedies. Failure to exhaust is the first ground for Partners' partial summary judgment motion, but BOR did not raise that issue.

### A. *Standing*

Before turning to the merits of this exhaustion argument, the court must consid-

er plaintiffs' contention that Partners "[l]acks [s]tanding to [a]ssert" that "[d]efense." Pl. Resp. (doc. 122) at 1:17. The only potentially relevant case to which plaintiffs cite, *Wright v. Inman,* 923 F.Supp. 1295 (D.Nev.1996), does not support their argument. *Wright* actually supports Partners' argument that they should be allowed to raise the exhaustion issue. In *Wright,* the United States Forest Service approved a mining company's expansion project on a national forest. Plaintiffs, adjacent landowners and opponents of that expansion, filed suit against the Forest Service alleged violations of the National Environmental Policy Act. The defendant/intervenor mining company, moved to dismiss for lack of subject matter jurisdiction, asserting that plaintiffs failed "to satisfy the APA's exhaustion requirement." *Id.* at 1299. The *Wright* court did comment that "[i]t [wa]s interesting . . . . that the Forest Service [did] not join[ ] in" that motion. *Id.* at 1299 n. 5. Nonetheless, the court did address the mining company's exhaustion argument on the merits. This court declines to rely upon that passing observation in *Wright* to find that Partners lack standing to raise exhaustion of administrative remedies.

### B. Waiver

Plaintiffs also suggest that the exhaustion requirement has been waived here. Plaintiffs contend that exhaustion is an affirmative defense and because BOR did not raise that defense in its answer or motion, Partners should not be allowed to raise it now. In other words, BOR waived its right to assert exhaustion, and thus, by extension, so did Partners. Assuming *arguendo* that exhaustion is waivable, the court declines to impute BOR's supposed waiver of that defense to Partners.

Partners explicitly asserted exhaustion of administrative remedies as an affirma-

tive defense in its answer. *See* Part. Ans. (doc. 14) at 8, ¶ 55. Moreover, the cases upon which plaintiffs rely to support their argument that exhaustion is waivable are readily distinguishable. None are even remotely similar to the present case. As Partners correctly point out, none of those cases "involved an intervenor attempting to protect a contractual interest created as part of a procurement process." Part. Reply (doc. 137) at 5:12–13. Under these circumstances, the court finds that Partners did not waive its right to assert failure to exhaust administrative remedies.

### C. Merits

Referring to section 704 of the APA and 43 C.F.R. § 12.76(b) (12), Partners contends that plaintiffs were "required to exhaust administrative remedies before" commencing this action. Part. Mot. (doc. 110) at 2:5. Section 704 allows for judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704 (West 2007). "That section means that when a statute or agency rule dictates that exhaustion of administrative remedies is required, the federal courts may not assert jurisdiction to review agency action until the administrative appeals are complete." *White Mountain Apache Tribe v. Hodel,* 840 F.2d 675, 677 (9th Cir.1988) (citation omitted). Here, the regulation which Partners invokes provides that "[a] protestor *must exhaust all administrative remedies* with the grantee and subgrantee *before pursuing a protest with the Federal agency."* 43 C.F.R. § 12.76(b)(12) (emphasis added). In accordance with that regulation, Partners believes that plaintiffs had an obligation to exhaust their administrative remedies with the County, and plaintiffs did not do that. Hence, the court should grant Partners' motion for partial summary judgment based upon failure to exhaust.

On the face of it, section 12.76(b)(12) does not apply here because it does not, as Partners believe, require exhaustion before seeking judicial review. That regulation mandates exhaustion of administrative remedies as a prerequisite only to agency review. Given the exceedingly narrow scope of Partners' exhaustion argument, the court finds that it has no merit.[10] Therefore, Partners are not entitled to partial summary judgment on that basis.

With the issues of subject matter jurisdiction, waiver of sovereign immunity and failure to exhaust administrative remedies behind it, the court, at last, can address the merits.

### III. Motions for Partial Summary Judgment

Basically, plaintiffs assert that they are entitled to summary judgment as to count one because "BOR improperly failed to ensure full and open competition" in the Scorpion Bay marina project in violation of "federal procurement law, regulation and policy." Pl. Mot. (doc. 88) at 9:9; and FAC (doc. 4) at 17, ¶ 80. As should be abundantly clear by now, BOR strenuously denies that this is a procurement action. Thus, BOR is taking the position that in count one plaintiffs are improperly relying upon the FPASA, "which is the organic authority for most of the regulations controlling procurement decisions." *See Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958, 966 (4th Cir.1984). Likewise, BOR asserts that in that count plaintiffs are improperly relying upon various regulations, BOR D & Ss and BOR policies, all of which govern procurement. The court will separately address the potential applicability of the FPASA, the cited regulations, and the cited BOR D & Ss and policies.

### A. FPASA

In its jurisdictional statement, plaintiff baldly alleges that it is asserting "violations of . . . FPASA[,]" among other statutes. FAC (doc. 4) at 2, ¶ 1. Nowhere in their FAC do plaintiffs articulate precisely what those alleged statutory violations are, however. Citing to the "purpose" section of the FPASA, the FAC merely alleges that that Act was "intended to provide the federal government with an economical and efficient system for procuring property and services." *Id.* at 14, ¶ 59 (citing 40 U.S.C. § 101). The FAC also cites to sections 121(a) and (c) of the FPASA. Respectively, those sections "authorize the President to "prescribe policies and directives necessary to carry out the FPASA[,] *id.* (citing 40 U.S.C. § 121(a)), and "authorize" the Administrator of General Services to "prescribe regulations to carry out" the FPASA. 40 U.S.C. § 121(c) (West 2005). That is the sum total of plaintiffs' FPASA allegations. Conspicuously absent from plaintiffs' memoranda of law filed herein is any mention of alleged FPASA violations. Accordingly, because plaintiffs have not even alleged, much less proven, a violation of the FPASA, defendants are entitled to summary judgment on count one insofar as it is premised upon such violations of the FPASA.

### B. Regulations

It is also possible to construe count one, however, as alleging that the BOR violated several regulations. The FAC alleges that the RMA is a "cooperative agreement[;]" and as such is governed by the regulations set forth in 41 C.F.R. Part 105. FAC (doc. 4) at 15, ¶ 60. The FAC then selectively

---

10. To some extent, Partners' reliance upon that particular regulation is understandable because count one refers to various subsections of 43 C.F.R. Part 12, although not that specific one.

quotes identical language from 41 C.F.R. § 105–71.136 and 43 C.F.R. § 12.76. Those sections outline "procurement standards" which "grantees and subgrantees will follow." "[w]hen procuring property and services under a *grant* [.]" 41 C.F.R. § 105–71.136(a) and (b) (emphasis added); and 43 C.F.R. § 12.76(a) and (b) (emphasis added). As the FAC alleges, those regulations state, *inter alia,* that "[a]ll procurement transactions will be conducted in a manner providing full and open competition[.]" 41 C.F.R. § 105–71.136(c)(1); and 43 C.F.R. § 12.76(c)(1). As the FAC further alleges, both regulations also state that "[s]ome of the situations considered to be restrictive of competition included ... [p]lacing unreasonable requirements on firms in order for them to qualify to do business ... and [a]ny arbitrary action in the procurement process." *Id.* The thrust of count one seems to be that BOR acted arbitrarily, capriciously and abused its discretion when it approved the Proposed UMA in violation of these regulations.

■ This argument fails on several grounds. First, the UMA is not a grant or a cooperative agreement; hence those regulations do not apply. Cooperative agreements are, *inter alia,* "legal instrument[s] reflecting a relationship between the United States Government and ..., a local government, ... when ... the principal purpose of the relationship is to transfer a thing of value to the ..., local government, ... to carry out a public purpose[.]" 31 U.S.C. § 6305(1) (West 2003). The applicable regulatory definition of "grant" subsumes "cooperative agreements." Grant "means an *award of financial assistance,* including cooperative agreements, in the form of money, or property in lieu of money, by the Federal Government to an eligible grantee." 43 C.F.R. § 12.43 (emphasis added).

It is patently obvious that the UMA is not a "cooperative agreement" in that it is not a "legal instrument reflecting a relationship between the United States Government and ... a local government[.]" *See* 31 U.S.C. § 6305(1). The UMA is between a local government, the County, and Partners, a private entity. Even deeming the County to be the United States government for purposes of the UMA, that agreement did not "transfer a thing of value to [a] local government to carry out a public purpose." *See id.* The purpose of the UMA was, as previously explained, to grant a concession to Partners, a non-federal entity, to develop, operate and maintain a marina complex at LPRP.

Likewise, the UMA is not a "cooperative agreement" in that the federal government was not awarded financial assistance under the UMA. Even proceeding under the theory that the County was acting as BOR's agent for purposes of the UMA, that would not be sufficient to transform the UMA into a cooperative agreement. That is because the concession agreement was not "an award of financial assistance" to Partners. In fact, Partners incurred significant monetary obligations thereunder in that it had to provide financing for the marina complex, as well as a "capital construction guarantee[.]" Admin. Rec., Vol. 1 at 000170, ¶¶¶ 6(A) and (B). In short, because the UMA is not a grant or a cooperative agreement, as a matter of law, plaintiffs cannot rely upon the regulations set forth in their FAC to sustain their first cause of action.

Attempting to bring the UMA within the scope of those regulations, the FAC alleges that the RMA is a cooperative agreement.[11] FAC (doc. 4) at 15, ¶ 60. Evident-

---

11. Wisely, plaintiffs did not allege, nor do they assert that the RMA is a grant. The

RMA could not be deemed a grant because it did not award "financial assistance" to the

ly plaintiffs are positing that if the RMA is a cooperative agreement governed by the regulations specified in the FAC, then because the RMA was the source for the UMA, those regulations govern the UMA too. The fact remains, however, that count one is challenging BOR's actions only with respect to the UMA. So, even if the RMA is a cooperative agreement, that is simply too remote a basis upon which to find that BOR had to comply with these regulations as to the UMA—which clearly is neither a grant nor a cooperative agreement.

### C. BOR Policies and D & Ss

Having found that the FPASA and the regulations cited in count one are inapplicable, the remaining possible sources for imposing a legally enforceable duty upon BOR are the D & Ss and policies in BOR's Manual. Count one of the FAC quotes from three D & Ss and two policies which BOR allegedly violated. BOR argues that by their terms, none of those items apply here. Even if substantively applicable, BOR contends that plaintiffs cannot rely upon those D & Ss and policies because those items are mere "guidelines[.]" BOR Resp. (doc. 114) at 19:3(citations omitted). They "do not have the force and effect of law and cannot form the basis of a claim for relief." *Id.* at 19:3–4 (citations omitted).

Taking the opposite view, plaintiffs counter that the D & Ss and policies in the FAC do apply here. Further, given the "mandatory" language of the Manual, plaintiffs contend that the cited D & Ss [12]

are binding on BOR. *See* Pl. Reply (doc. 118) at 6:5. In addition to the Manual's language, plaintiffs refer to a BOR letter which they construe as "confirm[ing] that BOR intended its D & Ss for concession management by non-federal partners to be binding." *Id.* at 9:9–10.

### 1. Applicability?

The court will first consider the applicability of the D & Ss and policies as alleged in count one. It will then go on to consider whether those items have the full force and effect of law.

The first D & S to which count one refers is from a D & S the "subject" of which is "Concessions Management by Non–Federal Partners[.]" *See* Admin. Rec., Vol. 1 at 000150. Quoting a single sentence from that 8 page D & S, the FAC states that BOR "'is responsible for continuous management oversight of managing partners and their concessions operations.'" FAC (doc. 4) at 16, ¶ 68 (quoting exh. O thereto at 1, ¶ 1); *see also* Admin. Rec., Vol. 1 at 000150, ¶ 1. This sentence does not mention procurement, acquisition, or even the broader concept of fair competition, as BOR emphasizes. Therefore, the only portion of this D & S to which the FAC refers does not, on the face of it, encompass any obligations on the part of BOR with respect to the RFP process.

As plaintiffs note though, paragraph 5 of this D & S (which the FAC does *not* mention) states that "[c]oncession development will adhere to the concession principles listed in" BOR's "Policy" governing "Concessions Management" policy. Ad-

County. The monies paid thereunder were in partial consideration for the County transferring land and facilities to BOR. Additionally, those monies were restricted in that they could "be utilized only in connection with recreational development of the LPRP wherein [BOR] has Federal land management responsibility." FAC (doc. 4), exh. A thereto at 7, Art. 4(c)(6).

**12.** The FAC quotes from two BOR *policies* as well. FAC (doc. 4) at 16, ¶¶ 71 and 72. Plaintiffs do not mention those policies in their Reply, however. Presumably plaintiffs' argument as to the supposedly binding nature of the D & Ss also applies to the policies.

min. Rec., Vol. 1 at 000152, ¶ 5. Among those "principles" are two which the FAC quotes verbatim. The first principle is to "ensure fair competition in the awarding of concessions contracts[.]" *Id.*, Vol. 1 at 000134, ¶ 3(E); *see also* FAC (doc. 4) at 16, ¶ 17 (internal quotation marks and citation omitted). The second is that "[c]oncessions will comply with applicable Federal, State, and local laws." *Id.*, Vol. 1 at 000134, ¶ 3(G); *see also* FAC (doc. 4) at 16, ¶ 72 (internal quotation marks and citation omitted). Thus, from plaintiffs' perspective the "management oversight" responsibilities in paragraph one of D & S (LND 04–02) include compliance with the just quoted policies.

Even assuming the validity of that argument, these "principles" are included in the "Policy" section of BOR's Manual. And, as will be seen, BOR's policies do not have the full force and effect of law. Consequently, plaintiffs cannot rely upon any alleged violation of those principles to support a claim of arbitrary and capricious conduct by BOR.

The FAC further alleges that in accordance with another D & S, "all concession contracts issued by non-federal partners must use language 'that complies with all applicable Federal laws, rules, regulations, and Executive Orders.'" *Id.* at 16, ¶ 69 (quoting exh. O thereto at ¶ 6(B)); *see also* Admin. Rec., Vol. 1 at 000153, ¶ 6(B). Plaintiffs' reliance upon this D & S is misplaced because as the court construes count one, they are not objecting to the language of the "concession contract," *i.e.*, the UMA. Plaintiffs are objecting to the language of the 2005 RFP. Regardless, to the extent the UMA can be read as alleging that the UMA violated this particular D & S, it, too, does not have the full force and effect of law, as will be explained momentarily.

The FAC next selectively quotes from another D & S which BOR purportedly violated. Plaintiffs sweepingly allege that the "Manual . . . requires BOR to ensure 'fair competition' in the RFP process." *Id.* at 16, ¶ 70 (quoting exh. P thereto (BOR Manual—LND 04–01) at ¶ 4(B)(1)); *see also* Admin. Rec., Vol. 1 at 000139, ¶ 4(B)(1). Plaintiffs' reliance upon this particular D & S is wholly misplaced. First of all, as BOR points out, this D & S is contained in that part of the Manual governing "Concessions Management by [*BOR* ] [.]" Admin. Rec., Vol. 1 at 000135 (footnote omitted) (emphasis added). The note to that title explicates that the D & Ss listed therein "apply to concessions managed *directly by* [BOR]." *Id.*, Vol. 1 at 000135, n. 1 (emphasis added). Continuing, that note advises, "Separate directives and standards address concessions managed by non-Federal partners." *Id.* There is no dispute that the marina which is the subject of the UMA is not "managed directly" by BOR. Thus, on the face of it this D & S does not apply here.

Even if this "fair competition" D & S had some application here, the FAC takes that phrase completely out of context. The "fair competition" phrase is part of an "approach" which "will be applied . . . [t]o allow for a wide distribution[ ]" of RFPs. *Id.*, Vol. 1 at 000139, ¶ 4(B). That phrase comes from the following sentence: "To ensure fair competition before and during the RFP process, meetings to discuss the RFP with existing or potential concessionaires or other outside parties must be conducted." *Id.* As can easily be seen, that D & S does not, as the FAC implies, impose some broad, overarching requirement of fair competition on the RFP process. Moreover, plaintiffs cannot rely upon this D & S to impose a legal duty upon BOR because as with the other D & Ss, it does not have the force and effect of law.

### 2. *"Full Force and Effect of Law"*

While "an agency can create a duty to the public which no statute has

expressly created, ... not all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court." *Multnomah Legal Services Workers Union v. Legal Services Corp.*, 936 F.2d 1547, 1554 (9th Cir.1991) (internal quotation marks and citations omitted). "To have the full force and effect of law ..., the internal documents must prescribe substantive rules— *not* interpretive rules, general statements of policy or rules of agency organization, procedure or practice[.]" *Id.* (internal quotation marks and citations omitted) (emphasis in original).

■ In the Ninth Circuit, "[t]wo factors determine whether a rule is interpretive or substantive." *Id.* First of all, a rule is "substantive ... with binding effect[ ]" if it "modifies or effects a change in existing rights, law or policy[.]" *Id.* (internal quotation marks and citation omitted). "If, however, the rule is only indicative of the agency's interpretation of existing law or policy, it is interpretive." *Id.* (internal quotation marks and citations omitted).

Second, "if the rule is promulgated pursuant to statutory discretion or under statutory authority, it is a substantive rule." *Id.* (internal quotation marks and citation omitted). But where "the agency does not exercise delegated legislative power to promulgate the rule, it is interpretive." *Id.* (internal quotation marks and citation omitted). As the Ninth Circuit has explained, "[t]o satisfy this requirement, [an agency's] policy must have been promulgated pursuant to a specific statutory grant of authority, so that a policy that was neither published in the Federal Register nor disseminated to the public for scrutiny and comment will not have the force and effect of law." *Id.* (internal quo-

tation marks and citations omitted); *see also Novell, supra,* 46 Fed.Cl. at 615 (internal quotation marks and citation omitted) (emphasis added by *Novell* Court) ("[T]o be entitled to force and effect of law, a binding agency regulation must, *at the very least,* be promulgated by an agency with the intention that it establishes a binding rule. Promulgation requires some act of publication, i.e., dissemination to the public.") BOR and plaintiffs agree that the two factors described above provide the framework for the court's analysis, but they disagree as to the results of that analysis.

■ Significantly, nothing on the face of the D & Ss or policies states or even suggests that they are modifying or effecting a change in any existing rights, law or policy. What is more, plaintiffs are not making that argument. Instead, plaintiffs place undue emphasis on what they deem to be the "mandatory" language contained in those D & Ss', policies, and elsewhere. For example, plaintiffs point to language stating that "concession contract[s] ... must meet the requirements of these Concessions Management D & Ss[;]" and "non-Federal concession contract[s] ... must be approved by [BOR]." Pl. Reply (doc. 118) at 8:2–4 (quoting exh. O to FAC at 2, ¶ 4(A)(1) and (2)); *see also* Admin. Rec., Vol. 1 at 000151, ¶¶ 4(A)(1) and (2). This language does not suffice, however, to render these D & S' substantive rules with binding effect, absent a showing that they modified or effected a change in existing rights, law or policy. Hence, the court finds that the D & Ss and policies which form the basis for count one lack the first essential element of a substantive rule.

■ Further undermining plaintiffs' argument that these D & Ss and policies are substantive, and not interpretative, are statements found on BOR's website.[13] As

---

13. Plaintiffs place a great deal of credence in

BOR's website when addressing the promul-

plaintiffs undoubtedly would stress, that website explicitly states that "[a]ll requirements in the [BOR] Manual are mandatory." http://www.usbr.gov/recam/ at 1. The court cannot ignore the larger context in which that statement appears though. BOR's website explains that its "Manual consists of a series of Policy and [D & Ss]." *Id.* "Collectively," those items "assign program responsibility and establish · and document [BOR]-wide methods of doing business." *Id.* The policies, as distinguished from the D & Ss, "reflect the [BOR] Commissioner's *leadership philosophy* and principles and *defines the general framework* in which [*BOR*] *pursues its mission.*" *Id.* (emphasis added). In a similar vein, the policies which the FAC quotes are included in a list of "Concessions Principles[.]" *See* Admin. Rec., Vol. 1 at 000133 at ¶ 3. The express purpose of those principles is to "*guide* the planning, development, and management of concessions[.]" *Id.* (emphasis added).

Balancing the polices are the D & Ss, which "provide the level of detail necessary to ensure consistent application of Policy [BOR]-wide[,]" while at the same time are "structured to provide flexibility to local . offices[.]" http://www.usbr.gov/recam/ at 1–2. In further explaining the significance of the policies and D & Ss, BOR's website indicates that those items "fall into two series[.]" *Id.* at 2. "Those in the Program series," such as the Land Management and Development D & Ss and policies in count one, "primarily direct and define [BOR]'s processes for the operation, maintenance, and use of its projects and facilities." *Id.*

As the foregoing amply demonstrates, the D & Ss and policies which BOR allegedly violated are not substantive rules. They are pronouncements of BOR's policies and practices regarding concessions management. Overall, the D & Ss and policies place a heavy emphasis on the internal workings of the BOR as is evidenced by the fact that those items "establish and document [*BOR* ]-*wide* methods of doing business." *Id.* at 1 (emphasis added). Likewise, those "program" policies and D & Ss "primarily direct and define [*BOR*'s] *processes* [.]" *Id.* at 2 (emphasis added). Hence, the court has little difficulty finding that the D & Ss and policies in count one constitute "statements of policy or rules of agency organization, procedure or practice[.]" *See Multnomah Legal Services Workers,* 936 F.2d at 1554 (internal quotation marks and citations omitted). They do not "purport[ ] to prescribe 'legislative-type' rules enforceable in federal court against the [BOR]." *See Rank v. Nimmo,* 677 F.2d 692, 698 (9th Cir.1982).

Turning to the promulgation issue, BOR acknowledges that its Manual is "made available to the public, principally through [its] website[.]" BOR Resp. (doc. 114) at 22:24. Despite that availability, because the Manual "is developed and promulgated entirely through an internal agency process, and is not made available for public review and comment through formal rulemaking or any other public process[,]" BOR contends that the D & Ss and policies therein are not binding, enforceable agency rules. *Id.* at 22:24–27.

Plaintiffs challenge that assertion because "it *appears* that BOR publishes, and

---

gation issue, but they did not request that the court take judicial notice of that website. In the exercise of its discretion, however, as Fed. R.Evid. 201(c) allows, the court will take judicial notice of BOR's website at http://www. usbr.gov/recman/. *See In re Charles Schwab Corp. Sec. Litig.,* —— F.R.D. ——, —— n. 18,

2009 WL 262456, at *23 n. 18 (N.D.Cal. Feb. 4, 2009) (even though "neither side offered the FASB [Financial Accounting Standards Board] concepts at issue for judicial notice," the court took judicial notice of those concepts because they are "publicly available from the FASB's website[ ]").

accepts public comment about[ ] draft [D & Ss] prior to adoption" on its website. Pl. Reply (doc. 118) at 9 (footnote omitted) (emphasis added). This acceptance of public comments, from plaintiffs' standpoint, "indicates that the [D & Ss] are binding, not merely policy." *Id.* at 10:1–2. In its reply, BOR adheres to the view that its Manual is the result of an "internal agency process and not subject to public comment." BOR Reply (doc. 134) at 11:27–28. As such, BOR explains that its Manual is not governed by the formal notice and comment procedures of section 553 of the APA.[14] Therefore, BOR reasons that plaintiffs cannot maintain a cause of action against it for alleged violations of the D & Ss and policies in BOR's Manual.

The court is fully cognizant that BOR's website invites "stakeholders to submit comments" regarding "*DRAFT* Polic[ie]s or [D & Ss]" by us[ing] the links below." http://www.usbr.gov/recam/ at 1 (emphasis in original). That website explains that BOR "will review and consider the comments received during the revision process[.]" *Id.* BOR unequivocally advises that it "will not provide responses to submitted comments[,] however." *Id.* The purpose of this dissemination is thus very different from dissemination allowing for "public scrutiny and comment" under the APA's formal rule making procedures. As the Ninth Circuit so aptly put it in *Rank,* "[N]ot all agency policy pronouncements which find their way to the public can be considered regulations enforceable in federal court." *Rank,* 677 F.2d at 698 (citation omitted). Especially because plaintiffs have not shown that any of BOR's

policies or D & Ss upon which they are relying were published in the Federal Register—a critical aspect of promulgation, and a hallmark of a substantive rule—those items do not have the full force and effect of law.

In a final effort to prove that the policies and D & Ss in BOR's Manual are binding, plaintiffs resort to a 1998 letter from BOR to the County. The import of that letter, plaintiffs believe, is that it "confirms" that BOR intended its concession management D & Ss to be binding. Pl. Reply (doc. 118) at 9:9. Hence, the court should give those D & Ss the full force and effect of law. In that letter, BOR approves the County's issuance of a RFP for a marina complex at LPRP, "which is to be issued on April 20, 1998[.]" PSOF (doc. 89), exh. 6 thereto at 1. More specifically, plaintiffs are relying upon the penultimate paragraph in that letter, stating that "It is important that the [County] adhere to" the enclosed D & Ss "during the RFP and selection process for the marina concessionaire." *Id.* Even if admissible,[15] this reminder by BOR, approximately seven years before the events complained of in count one, does not establish its D & Ss and policies have the full force and effect of law.

In sum, even if plaintiffs were successful on their argument that BOR violated its Manual by not ensuring the County's compliance therewith, and by approving the UMA, because they have not shown that that Manual has the full force and effect of law, violations of the Manual's terms are not enough to prove that the UMA is invalid. *See Frazier v. United States,* 79

---

14. That section exempts from the APA formal notice-and-comment procedure, "interpretative rules, general statements of policy, or rules of agency organization, procurement, or practice[.]" 5 U.S.C. § 553(A) (West 2007).

15. This letter pertains to the 1998 RFP, which is not the subject of count one. It is

thus irrelevant and so inadmissible under Fed.R.Evid. 402. And because the court "may only consider admissible evidence on a motion for summary judgment[,]" it cannot consider this letter. *See Ballen v. City of Redmond,* 466 F.3d 736, 745 (9th Cir.2006) (citation omitted).

Fed.Cl. 148, 164 (2007) (emphasis added) (and cases cited therein), *aff'd without published opinion,* 301 Fed.Appx. 974 (Fed.Cir.2998) ("Even if the court had been convinced that something in the bonus points provision of the prospectus violated the 'fair competition' pronouncement in [BOR's] manual, plaintiffs have *not alleged,* and have *certainly not proved,* that the manual carries the force of law."); *see also Infrastructure Defense Technologies, LLC v. United States,* 81 Fed.Cl. 375, 397 (2008) (citations omitted) (defense contractor in pre-award bid challenge could not rely upon Department of Defense Directive because it did "not establish[ ] that the Directive has the effect of a statute or regulation such that acting inconsistently with its provisions would constitute grounds to set aside or enjoin th[at] solicitation[ ]"). Put differently, even if shown, a violation of BOR's policies and D & Ss "would not constitute arbitrary and capricious agency action" by BOR because those policies and D & Ss lack the force and effect of law. *See Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 840 (1999) (citation omitted).

The fundamental weakness with count one is that plaintiffs have not shown, and indeed for the reasons set forth above, could not show a statutory, regulatory or policy which BOR violated by approving the UMA. Absent such a violation, plaintiffs cannot show that the BOR acted arbitrarily, capriciously, or abused its discretion in approving the UMA. Thus, for the reasons set forth above, the court finds that BOR and Partners are entitled to summary judgment as to count one. Conversely, the court must deny plaintiffs' motion for summary judgment as to that count.

## IV. Motions to Strike and Supplement Administrative Record

With one exception,[16] resolution of the parties' summary judgment motions did not require the court to resort to any documents beyond the Administrative Record. Therefore, the court DENIES as moot the motions to strike (docs. 106; 107 and 124), as well as plaintiffs' motion to supplement the administrative record (doc. 87).

### Conclusion

For the reasons set forth above, the court hereby ORDERS that:

(1) "Plaintiff's Motion to Supplement Administrative Record" (doc. 87) is DENIED as moot;

(2) Plaintiffs "Motion for Summary Judgment" (doc. 88) is DENIED;

(3) "Federal Defendants' Motion to Strike Extra Record Declarations" (doc. 106) is DENIED as moot;

(4) "Marina Partners' Motion to Strike Plaintiffs' Motion for Summary Judgment, Separate Statement of Facts, and Its Attached Exhibits" (doc. 107) is DENIED as moot;

(5) "Marina Partners' Counter Motion for Summary Judgment" (doc. 110) is GRANTED;

(6) "Federal Defendants' Cross–Motion for Summary Judgment on Count One of the First Amended Complaint" (doc. 114) is GRANTED; and

(7) "Plaintiffs' Motion to Strike Exhibits 1 and 3" (doc. 124) is DENIED as moot.

IT IS FURTHER ORDERED that a Joint Proposed Pretrial Order shall be lodged by April 20, 2009.

IT IS FURTHER ORDERED setting a Pretrial Conference on May 11, 2009 at

---

**16.** The court did refer to one document not in the Administrative Record—the 1998 letter from BOR to the County. However, because it was irrelevant, that letter did not impact the court's analysis.

10:30 a.m., in Courtroom 606, Sixth Floor, Sandra Day O'Connor United States Courthouse, 401 West Washington Street, Phoenix, Arizona. A trial date and any other necessary deadlines will be set at the Pretrial Conference.